**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LIPMAN BROTHERS, INC., et al., Respondents.**

No. 6526.

United States Court of Appeals First Circuit.

Heard Dec. 6, 1965.

Decided Jan. 21, 1966.

Anthony J. Obadal, Atty., with whom Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Solomon I. Hirsh, Atty., N.L.R.B., Washington, D. C., were on brief, for petitioner.

Murray Brown, Boston, Mass., with whom William F. Joy and Morgan, Brown, Kearns & Joy, Boston, Mass., were on brief, for respondents.

Before ALDRICH, Chief Judge, and McENTEE and COFFIN, Circuit Judges.

McENTEE, Circuit Judge.

This is a petition brought by the National Labor Relations Board for enforcement of its order issued on June 30, 1964, against the respondent, Lipman Brothers, Inc., et al, following the usual proceedings taken under Section 10(c) of the National Labor Relations Act. The order is based upon the Board's findings [1] that the respondents interfered with, restrained and coerced their employees in violation of Section 8(a)(1) of the Act (29 U.S.C. § 158) by promising benefits to, threatening, interrogating and otherwise harassing said employees because of their union activities; that the respondents violated Sections 8(a) (3) and (1) of the Act in that, acting under various pretexts, they suspended three and discharged four other employees [2] for engaging in union activities

1. This matter was heard originally by a trial examiner who filed an Intermediate Report. The findings, conclusions and recommendations of the trial examiner were adopted by the Board except that the termination of Charles Bolduc, one of the employees involved in the instant proceedings, was found by the Board to be a constructive discharge in violation of Section 8(a) (3) of the Act. This finding and the finding of the trial examiner are discussed in the body of this opinion.

2. The discharged employees are Simon Gilbert, Robert G. Duplessis, Charles Bolduc and Leo Levasseur.

and that in addition the respondents discriminatorily discharged one of said employees (Levasseur) in violation of Section 8(a)(4) of the Act because he testified in favor of the union at the Labor Board hearing.

The respondents are resisting enforcement of the Board's order on only two grounds: (1) The Board's findings that the discharge of Gilbert, Duplessis, Bolduc and Levasseur violated the Act were not based upon substantial evidence in the record taken as a whole, and (2) the scope of the Board's order is too broad in that it should not have been issued against all the respondents.[3]

The evidence upon which the Board's findings are based may be summarized as follows. Respondents are engaged in the business of raising, processing and selling poultry.[4] In mid-July of 1962 the union [5] began a campaign to organize respondents' employees at its Augusta plant and appointed an eleven man employee organizing committee. From the latter part of July until the election which was held on September 20 and 21, the union conducted an intensive membership campaign. It was during this period that three of the four employees who are the subject of this proceeding were discharged. The fourth employee (Levasseur) was discharged on February 4, 1963, shortly after he had testified at a hearing before the trial examiner in this case. The events relating to said discharges are these.

### 1. SIMON GILBERT.

This employee was fired on August 6, 1962. He was a very active member of the union organizing committee which had only recently been appointed, had actively solicited his co-workers to join the union and secured signed authorization cards from thirty-five to forty fellow employees. On two occasions within two weeks prior to his discharge, he distributed handbills and union literature in front of respondents' Augusta plant. There is evidence that on both of these occasions his activities were observed by the management.

Gilbert's duties required him to work at a trough where running water was sprayed from a pipe for use in the eviscerating process. On the morning of August 6th the water was running too rapidly and failing to find some pliers, he used a pair of poultry shears, known as neckcutters, to adjust the flow. In doing so, the cutting blade on the shears was damaged. Immediately thereafter Gilbert was ordered to the foreman's office and was summarily dismissed for having misused the shears.[6] There was testimony that other workers, including the floorlady, had occasionally used shears to turn down the water. Also there was testimony that prior to this time two bosses saw Gilbert use neckcutters to reduce the water flow and did not complain; that Gilbert was a good worker and in view of this was assigned to work at various jobs in the plant wherever and whenever he was needed. On the day after Gilbert's discharge, Roger Lavallee, a fellow employee in the same room and also a member of the union organizing committee, received the following warning from the assistant foreman, "Draw your birds right, or you are going to get fired. You're next on the list. * * * We fired one yesterday."

The respondents sought to justify this discharge on the ground that Gilbert in adjusting the water flow, disobeyed company instructions and in misusing and

---

3. The other six respondents are Lipman Poultry Products, Inc., Riverside Poultry Farms, Lipman Poultry Farms, Inc., By Products, Inc., Samuel Lipman Sons and Pinecrest Hatcheries, Inc.

4. Respondents' principal places of business are in Augusta, and Winslow, Maine and they have additional business facilities in other parts of the state.

5. Local 385, Amalgamated Meat Cutters and Butcher Workmen of North America, AFL-CIO.

6. There is evidence that the cost of a new pair of poultry shears is $2.95. The cutting blade, the only portion of the shears damaged by Gilbert, was repairable by resharpening and when necessary could be replaced.

damaging the neckcutters, violated a posted company rule.

## 2. ROBERT G. DUPLESSIS.

Duplessis was discharged on August 29, 1962, after being employed by the respondents for more than three years. He was a good worker, never had been a disciplinary problem and on occasion had been complimented for his work. He worked on a processing line in the eviscerating room.

Duplessis was chairman of the union organizing committee and was very active in the union campaign. He obtained between thirty-five and forty signed authorization cards from fellow employees. Respondents were aware of this effort and also of his activity in distributing union literature at the plant entrances. On the day of his discharge Duplessis needed to attract the attention of a co-worker, one Mary Tuttle, who was stationed a few feet away from him in the line. In doing so, he reached over and nudged Tuttle's boot with his foot. Thereupon she turned to Duplessis and said "Just because you're in the Union, that doesn't mean you can boss everybody on the line." Nothing more was said. Shortly thereafter, Duplessis was ordered to report to the main office where he found his bosses talking with three policemen. The policemen escorted Duplessis into a private office and first asked him if he had signed a union card. After answering that he had, he was asked whether he had kicked employee Tuttle. This he denied and said that he had only nudged her. Tuttle confirmed the fact that Duplessis had only nudged her, and when asked whether she cared to press charges, declined to do so. Later she was again asked if she wanted to press charges and again she declined. Thereupon Frank Lipman [7] conferred with Tuttle alone in his office and when they emerged, Lipman announced, "We'll press charges." [8] He then told Duplessis he was discharged.

The respondents contend that Duplessis was discharged for violating a company policy that any employee involved in a fight while on duty is subject to immediate dismissal, and cited instances where this policy had been enforced.

## 3. CHARLES BOLDUC.

Bolduc, a four year employee, was also an active supporter of the union's campaign to organize the plant. He approached about one hundred of his co-workers to join the union and secured about thirty-five signed authorization cards. He was also a member of the union's bargaining committee and his union activities were a matter of common knowledge in the Augusta plant.

It was Bolduc's testimony that on the day he returned from his vacation in late July his foreman said to him, "I hear you are a Union man." He replied that he was and according to Bolduc his troubles at the plant then began. That morning he was told by his foreman that his job of releasing birds [9] was discontinued. In assigning him to a more arduous job, the foreman commented, "You have had it easy enough around here long enough. You're going to do some work." On this job he was required to work in a very hot, uncomfortable room and when he complained about this and mentioned his seniority, the foreman replied, "The Union isn't in here * * * there is no seniority." [10]

7. Three of the Lipman brothers, Frank, Bernard and Harold, are officers in the various respondent corporations and are active in the day to day management of the business.

8. Duplessis subsequently pleaded guilty to a charge of assault and battery and was fined $10 and costs. Respondents supplied legal counsel for Tuttle in connection with this incident. On previous occasions involving similar incidents no policemen were called to the plant, no charges were ever pressed, and the company never provided any one with an attorney.

9. Bolduc had the job of "releasing birds from the killing line" for a period of about two years.

10. Bolduc was senior man in his department. While seniority rights were not recognized in the plant, it generally was the practice to give those with the longest tenure the best jobs.

During the six weeks that followed Bolduc was transferred again and again, each time to a job requiring a great deal of tiring effort. Bolduc testified that on his first day of his last re-assignment, the foreman remained close by and frequently criticized his work in a loud, profane manner. That evening Bolduc obtained a statement from his doctor that he was under treatment for coronary insufficiency and should not be required to perform any strenuous work. This statement was presented to the company nurse when he reported for work the next morning.

During the morning Bolduc requested a fellow employee to relieve him while he went a short distance to get a drink of water. The foreman observed this and immediately ordered him back to his job, declaring to the fellow employee that Bolduc was a "union agitator and that he was going to see that he did some work." Later that morning, Bolduc was called to the main office where he was questioned about his heart condition. While there, Frank Lipman commented, "I hear you made quite a speech at the union meeting." In answer to questions regarding his heart condition, Bolduc explained that his heart had not bothered him on his old job, and it was not until he had been given strenuous work that he had difficulty. Bolduc was then given the rest of the day off with pay.

The evidence shows that after this meeting Bernard Lipman phoned Bolduc's doctor who told him that Bolduc should be given "light work." Lipman asked if a night watchman's job would be suitable and the doctor replied that this was the type of job he should have. The next day, August 14, Lipman offered Bolduc a night watchman's job at respondents' grain mill which was located several miles away. Bolduc objected to being assigned to solitary night work so far away and requested his old job back, but Lipman replied that this was the only available work which was suitable for him. Bolduc refused the night watchman's job and thereupon was given his final pay check. The respondents testified that Bolduc was not fired but that he quit voluntarily when offered the watchman's job.

### 4. LEO LEVASSEUR.

Levasseur was employed as a lead man on one of respondents' road crews. Each morning these crews were sent to numerous poultry farms and brought back chickens to respondents' Augusta plant. On January 9, 1963, Levasseur testified against the company at the hearing before the trial examiner. There is evidence that following this testimony the general foreman directed that Levasseur's overtime be reduced. There is also evidence that about two weeks before his discharge, Levasseur's immediate superior questioned him as to whether he had been talking with any of the men about the union, and warned him that "if anything should happen, the least little mistake," it would provide a way to "get rid" of him. Levasseur also testified that on or about January 15th, he was summoned to report to Harold Lipman who asked him, "how come you testified at the hearing?" On or about January 25, Lipman again asked Levasseur why he testified against the company.

On the morning of February 4, Levasseur's road crew was making a pickup at a poultry farm in the Augusta area. This required the removal of a large number of birds from two pens located in a barn. The loading process requires some degree of skill in order to prevent panic amongst the birds, thereby causing "a pile up." While Levasseur and another employee (Lewis) were in the barn, the driver of one of the trucks suddenly turned on his lights and raced the engine in an attempt to avoid getting mired in a snow bank. When he did this, the birds in each pen started to panic. Levasseur immediately began circling along the walls of his pen, which is the technique used to prevent the birds from piling up against a wall and being smothered. Employee Lewis ran into the adjoining pen where a pile up had al-

ready developed. He started separating the birds and called to Levasseur for help. Levasseur said he remained in his own pen to prevent a similar pile up there. .The whole incident lasted only a few minutes. Approximately twenty-three birds [11] were lost in Lewis' pen. There were no casualties in Levasseur's pen. When the foreman discovered what had happened, he told Levasseur this would probably cost him his job and "it's just what they've been waiting for to happen." Employee Lewis blamed Levasseur for the loss of the birds. A report of this incident was radioed to the plant and the general foreman went to the scene immediately and made an investigation. Later that morning when the road crew returned to Augusta, the plant manager questioned the employees involved regarding the pile up, and Levasseur was thereupon discharged. The respondents claim they discharged Levasseur for dereliction of duty in not helping Lewis.

Based upon the facts above stated, the Board adopted the trial examiner's findings that the reasons offered by the respondents for the discharge of Gilbert, Duplessis and Levasseur were mere pretexts, that these discharges violated Sections 8(a)(3) and (1) of the Act and in the case of Levasseur also violated Section 8(a)(4) of the Act. The Board also found that the real reason for Gilbert's discharge was his union activity and not because he misused an inexpensive item of company property; that Duplessis was fired not because of the nudging incident above mentioned but actually because of the respondents' desire to get rid of a well known union organizer; that the true motivation for Levasseur's discharge was not his failure to help his fellow employee avert a pile up but his union affiliation and particularly because he testified against the respondents in the Labor Board hearing. With reference to Bolduc, the Board adopted the trial examiner's conclusion that Bolduc's har-

assment and frequent transfers to various onerous jobs after it was learned he had become active in the union, were discriminatorily motivated and that in condoning this conduct the respondents violated Section 8(a)(1) of the Act. In addition, the Board concluded, contrary to the trial examiner, that this unlawfully motivated conduct amounted to a constructive discharge in violation of Section 8(a)(3) of the Act in that it affected the conditions of Bolduc's employment. It found that the series of transfers and harassments above mentioned forced Bolduc to call his physical condition to the attention of the respondents, who immediately used this as a pretext to offer him a job at the grain mill several miles away from the bargaining unit just before the election.

Amongst other things, the Board's order requires the respondents to reinstate these four employees with back pay, plus interest.

■ This court's function, under the Act, is merely to determine whether on the record taken as a whole, there is substantial evidence to support the Board's findings that the discharges in question violated the above stated sections of the Act. Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S. Ct. 456, 95 L.Ed. 456 (1951); N.L.R.B. v. Lowell Sun Publishing Company, 320 F.2d 835 (1st Cir. 1963).

■ In evaluating these discharge situations the pivotal factor is motive. N. L.R.B. v. Whitin Machine Works, 204 F.2d 883 (1st Cir. 1953). Sometimes, as here, this is a close question. In the instant case the evidence is conflicting on nearly every factual issue. This raises questions of credibility and gives rise to inferences to be drawn from the evidence. As stated by this court in Editorial "El Imparcial," Inc. v. N.L.R.B., 278 F.2d 184, 187 (1st Cir. 1960), the drawing of inferences "is a matter best left to the Board with its vast experience

11. The evidence showed that the loss of 20–25 birds per week was not unusual. On one previous occasion 123 birds were lost in one pile up. No one had ever been previously fired for a pile up.

in dealing with labor disputes. Such inferences, if reasonable, are not to be set aside by the court." See also N.L.R.B. v. Lowell Sun Publishing Company, supra.

To begin with, there is ample evidence in the record that the respondents were vehemently opposed to the union coming in to organize their plant. While this is not directly in issue in the instant proceeding, the respondents' vehement opposition to the union is of significance in determining whether the discharges here were actuated by anti-union motives.

In reviewing each of these four discharge situations and without repeating the evidence here, it seems to us that the respondents seized upon what at best were only technical grounds for dismissal which even if proven valid, under the circumstances hardly justified the drastic action taken. Moreover, it appears that the respondents were watchfully waiting for these four union enthusiasts to give the respondents the slightest reason or pretext to get rid of them because of their union activities. It is well settled that the mere existence of a valid ground for discharge is no defense to an unfair labor charge if such ground was a pretext and not the moving cause. N.L.R.B. v. Solo Cup Company, 237 F.2d 521 (8th Cir. 1956); N.L.R.B. v. Whitin Machine Works, supra.

From our examination of the whole record, we feel that the inferences drawn by the Board were reasonable and that the Board's findings were supported by substantial evidence.

Respondents raise the subsidiary question that the scope of the Board's order is too broad and should be limited to the respondent Lipman Brothers, Inc. They contend that there is no evidence that any alleged unfair labor practices were committed by any of the other six respondents. It was stipulated for the record that the three Lipman brothers are corporation officers and directors of all the respondent corporations. Furthermore, the record shows that the respondents admitted in their answer filed in this case that they are affiliated businesses and *joint employers* with common officers, ownership, directors and operators and constitute a single integrated enterprise; that said directors and operators formulate and administer a common labor policy for all the respondents and affecting the employees of all the respondents. Under these circumstances, it was appropriate for the Board to issue an order directed against all the respondents. See N.L.R.B. v. Stowe Spinning Co., 336 U.S. 226, 227, 69 S.Ct. 541, 93 L.Ed. 638 (1949).

A decree will be entered enforcing the order of the Board.