**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**YALE MANUFACTURING COMPANY, Inc., Respondent.**

**No. 6572.**

United States Court of Appeals
First Circuit.

Heard Jan. 3, 1966.

Decided Feb. 1, 1966.

A. I did, sir.
Q. What did you see inside of it?
A. I saw these weapons right here."

Bernard M. Dworski, Washington, D. C., Atty., N. L. R. B., with whom Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Allison W. Brown Jr., Atty., N. L. R. B., Washington, D. C., were on brief, for petitioner.

Julius Kirle, Boston, Mass., for respondent.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

McENTEE, Circuit Judge.

In this proceeding the National Labor Relations Board petitions us to enforce its order of January 18, 1965, against the respondent, Yale Manufacturing Company, Inc. The order is based upon the Board's findings [1] that the respondent engaged in a number of unfair labor practices proscribed by Section 8 of the National Labor Relations Act. (29 U.S.C. § 158). The only findings challenged by the respondent in this proceeding are as follows: (1) that the respondent violated Section 8(a) (1) of the Act in that it threatened employees with economic reprisals for adhering to the union; (2) that it solicited its employees to retract union authorizations

---

[1]. This case was heard originally by a trial examiner as provided in the Act. Upon review of the record of that proceeding the Board adopted the findings, conclusions, and recommendations of the trial examiner. The Board's decision and order are reported at 150 N.L.R.B. No. 100.

executed by them and (3) that the respondent violated Section 8(a) (3) and (1) of the Act in that it discriminatorily discharged four employees.[2]

■■ The respondent contends that these findings, considered on the record as a whole, are not supported by substantial evidence and therefore the order against it should not be enforced. Respondent also contends it was deprived of a full and complete hearing in this case by the Board's denial of its motion to reopen the case for the purpose of introducing certain exhibits. As to this last, the record indicates that this motion was untimely and was also objectionable on other grounds.[3] The question whether it should have been granted seems to us to be one which is solely within the discretion of the Board and under the circumstances here, we cannot say the Board abused its discretion or deprived the respondent of its rights in denying the motion. See Metal Blast, Inc. v. N. L. R. B., 324 F.2d 602, 604 (6th Cir. 1963).

A determination of the substantial evidence question raised by the respondent requires some recital and discussion of the evidence upon which the challenged findings are based. Respondent is engaged in the manufacture and sale of chrome furniture, wrought iron furniture and related products. Its place of business is in Roxbury, Massachusetts. In the latter part of December 1963 some of respondent's employees decided they wanted a union in the plant and took immediate steps to bring this about. As a result, a union representative appeared at the plant on the morning of January 16, 1964, and passed out union literature and union authorization cards to the employees as they entered the plant. The activities of this union representative were observed by foreman Eugene Biaggi and shortly thereafter the events which are the basis of the complaint in this case began to happen.

Substantially, they are as follows. During the morning of January 16th Biaggi separately questioned two of the employees as to whether they were going to join the union.[4] Later the same morning foreman William Stone asked employee Dunnell "who started the union," and when told by this employee at a prearranged meeting later that day that employee Arthur Gear started it, Stone expressed surprise and asked if he thought it would do any good "if we talked to the boys. * * * " When Dunnell indicated it would not, Stone said to him "Alright go ahead down and keep your ears open."[5] Perhaps the most impor-

2. The four discharged employees are Arthur Gear, his brother Edward Gear, James Dunnell and Charles Garvin.

3. The trial examiner's decision is dated October 5, 1964. The Board's ruling on the respondent's motion to reopen the hearing is as follows:

"On November 10, 1964, Respondent filed a motion to reopen the hearing and on November 24, 1964, Respondent filed an amendment to its motion. The purpose of Respondent's motion was to introduce into the record certain documentary evidence which Respondent alleges was stipulated by the parties, but inadvertently was not included in the record. Counsel for the General Counsel, in his reply, states that no such stipulation was entered into or received in the record. In view of the disagreement of counsel as to whether the alleged stipulation was entered into, the absence of any statement in Respondent's Motion describing the circumstances under which the alleged stipulation was entered into and made a part of the record, and the absence of any indication in the record that such a stipulation had been proposed or otherwise discussed, and as the Motion demonstrates on its face that the evidence Respondent seeks to introduce was available at the time of the hearing, we deny Respondent's Motion to reopen the hearing for purposes of receiving the proffered evidence. The request for oral argument by Respondent is hereby denied as, in our opinion, the entire record, including supporting briefs, adequately sets forth the issues and positions of the parties."

4. The union involved here is the United Brotherhood of Carpenters and Joiners of America, AFL–CIO.

5. The next day Dunnell had another meeting with Stone upstairs in the plant and

tant happening of that day from the standpoint of the findings in this case was a meeting of the employees called by management and held in the plant shortly before closing time. Present at this meeting, in addition to the employees, were foremen Biaggi and Stone, Gershorn Rosenthal, treasurer, and his brother Benjamin Rosenthal, who was also an officer of the company. Benjamin Rosenthal convened the meeting with the statement that he heard some of the employees had signed and mailed in union authorization cards.[6] At that point he admonished the employees to think very carefully about what they were doing; that they had always gotten fair treatment in the shop; that there wasn't a man there who could remember him laying anybody off and that no matter how slow things were the company always found something for the men to do. Then Stone said the men should think over very carefully how they had classified themselves on the union authorization cards and singling out one employee as to how he had classified himself, stated that if he was going to have to pay union wages he was going to get union help that could do that type of work. He then added that if the union came in a lot of men would get fired or released or laid off and a lot of men would take a cut in pay. Finally, treasurer Rosenthal concluded the meeting by inviting the men to retract the authorizations given to the union.

There was also evidence that after this meeting foreman Biaggi warned the two Gear brothers that if the union came in they would be the first to go, because of their lack of experience. Both Gears testified that on the very next day (January 17th) when each of them asked Biaggi about a pay raise which he had promised them at the time they were hired, Biaggi replied that due to the

union activity in the plant all raises were cancelled until further notice, or words to that effect. Also, employee Brown testified that during this period Stone told him if the union came in he (Stone) would take certain unpleasant drastic action against him.

Employee Denniston testified that in January 1964 Biaggi told him there never would be a union in Yale Manufacturing Company because he wouldn't allow it. Then after chiding Denniston about joining the union, Biaggi admonished him as follows:—"You're buying a new house, keep my advice and keep your nose clean."

 Although at the meeting with the employees on January 16th, one of the Rosenthals stated it was up to the men whether they wanted the union or not, it is clear from the record that the respondent all during this period manifested a strong anti-union animus and took prompt action to suppress the union once it had learned about it. The respondent's officers and foremen either denied or gave different versions of most of the happenings cited above, but it is to be noted that, by and large, the trial examiner and the Board credited the testimony of the employees. This court has held that questions of credibility are for the Board subject to judicial review only when the Board oversteps the bounds of reason. N. L. R. B. v. Bangor Shoe Mfg. Co., Inc., 308 F.2d 948, 949 (1st Cir. 1962). No such overstepping is found here. There was abundant evidence to support the Board's findings that the respondent threatened its employees with economic reprisals for adhering to the union and that it solicited them to retract their union authorizations. It is well settled that such conduct clearly violates Section 8(a) (1) of the Act. See N. L. R. B. v. Lowell Sun

told Stone he was not going to tell him anything more; that he was with the union 100% and that he thought he had already told Stone too much about the union organizing campaign.

6. At the time there were nineteen production and maintenance employees in the respondent's plant. Employee Arthur Gear testified he collected fifteen signed authorization cards on that day (January 16th) which he mailed to the union during his lunch period that day.

Publishing Co., 320 F.2d 835, 840 (1st Cir. 1963); Edward Fields, Inc. v. N. L. R. B., 325 F.2d 754, 759 (2d Cir. 1963); N. L. R. B. v. Jack Smith Beverages, 202 F.2d 100, 101 (6th Cir. 1953).

We now come to a consideration of the four discharges. Arthur Gear and his brother Edward were laid off[7] on February 3, 1964, during the height of the union organizing campaign. Both were members of the union. In fact it was Arthur who made the initial contact which resulted in the union coming into the plant. He was credited by his fellow employees with starting the union and was perhaps the most active employee in it.[8] The management knew Arthur Gear was instrumental in starting the union, having been so informed by employee Dunnell. It was also aware of his continued union activities, having seen him conferring several times with the union representative. As previously stated, both Arthur and his brother Edward had been singled out by their foreman as being the first to go if the union came in, yet Arthur continued openly in his union organizing activity.

Respondent claims the layoff of the Gear brothers was precipitated by economic reasons. Evidence was introduced showing that the company's sales figures for January and February 1964 indicated a drop in orders. Respondent also claims that due to lack of work two employees had to be laid off and it decided upon the Gear brothers because they were the most recent employees hired and also because foreman Biaggi was dissatisfied with their work. The Board rejected these reasons as mere pretexts and found that the layoff of Arthur Gear was discriminatorily motivated because of his union activity and that Edward Gear was also discriminatorily discharged not only because he was Arthur's brother and was likely to have the same union attitude, but to lend credence to the reasons advanced for the dismissal of Arthur who was the employee the company was really anxious to remove from the scene.[9]

Employees Dunnell and Garvin were discharged some two weeks later. Both were upholsterers who worked side by side on the same bench. Stone was their foreman. Both of them had signed union authorization cards. It should be noted here that Dunnell was the one who informed Stone that Arthur Gear started the union and who later told Stone he was with the union 100% and was not going to tell him anything more about the union.[10] Dunnell testified that on February 5th, he asked Stone why he was fighting the union so much to which Stone replied, "How would you like me to come to East Boston and tell you how to run your home?" Stone testified that about the middle of February he came to the conclusion that production was slowing down and at that time he timed the upholstering work of Garvin and Dunnell to see if they were engaged in a slowdown. Stone claimed that when he timed these two employees he found them to be turning out less work per hour than the normal rate. Dunnell and Garvin denied the slowdown and explained that this decrease in the production rate was due to the unusual kind of material then being used. It was Dunnell's testimony that on February 19th after Stone had again complained to them about the number of seats they were producing, he said to his fellow employee, Garvin, "Don't do any more than we're doing now. He's just trying to pressure us on account of the Union." Respondent relies on this as evidence of a slowdown. On February 19th Stone timed Dunnell and Garvin

---

7. It is undisputed that respondent had no seniority policy and no recall policy with respect to layoffs. Although respondent used the term layoff to describe the termination of the employment of the Gear brothers, in view of its policy of never recalling employees who had been laid off, respondent's action here was tantamount to discharge.

8. See footnote 6, supra.

9. The respondent in claiming that the layoffs were predicated on length of service could not very well lay off Arthur who had been hired about a month earlier than his brother, without also laying off Edward.

10. See footnote 5 (supra).

three times and after the third time complained to them, "Is that all I get for an hour's work?" Dunnell answered, "Bill that's all you know we can do with this stuff." Stone then replied he would not stand for any slowdown and thereupon discharged both Dunnell and Garvin.

On the basis of this evidence the Board found that Dunnell was fired not because of a slowdown, but in retaliation for his refusal to continue as an informer for the company and because of his adherence to the union; and that Garvin was discharged in order to support respondent's alleged reason for dismissing Dunnell.[11]

■■ We have examined the entire record with care and we are satisfied that with reference to these four discharges, the inferences drawn by the Board were reasonable and the Board's findings are supported by substantial evidence. The respondent's contention that the Gear brothers were laid off because of lack of work is not convincing. The timing of these discharges was significant. They occurred during the height of the union campaign. There was evidence that the months of January and February were normally slack months for the respondent and it had been a company policy not to lay off employees during the normal slack season, "* * * no matter how slow things were." The Board in rejecting respondent's reasons for the layoffs as pretextual, discredited the testimony of foreman Biaggi that Arthur Gear's work was unsatisfactory and credited the testimony of Gear as corroborated by a fellow employee.[12] As

we have previously stated, questions of credibility are for the Board, N. L. R. B. v. Bangor Shoe Mfg. Co., Inc., supra, and we shall not substitute our judgment for that of the trial examiner who heard the testimony and observed the witnesses, nor for that of the Board with its vast experience in dealing with labor disputes. N. L. R. B. v. Lowell Sun Publishing Company, supra, 320 F.2d at 840; N. L. R. B. v. Lively Service Company, 290 F.2d 205, 208 (10th Cir. 1961).

■ Nor do we feel that the Board's findings that the discharges of Dunnell and Garvin violated Section 8(a)(3) and (1) of the Act were unsupported by substantial evidence. The Board refused to accept respondent's reasons for these discharges, namely, that Dunnell and Garvin were engaged in a slowdown. The record reveals that foreman Stone did not check the production of all the other employees but singled out Dunnell and Garvin for surveillance. This, together with their union membership, lends support to the Board's conclusion that these discharges were discriminatorily motivated. Whether or not there was a slowdown in the plant or whether Dunnell and Garvin participated in it, is not dispositive in the circumstances of this case. It is well settled that the mere existence of a valid ground for discharge is no defense to an unfair labor charge if such ground was a pretext and not the moving cause. N. L. R. B. v. Lipman Brothers, Inc., et al., 355 F.2d 15 (1st Cir. 1966); N. L. R. B. v. Whitin Machine Works, 204 F.2d 883, 885 (1st Cir. 1953). From the evidence,

---

11. The respondent in claiming that the reason for these discharges was the slowdown in production could not very well fire Dunnell without also dismissing Garvin since they worked together on the same upholstering bench and their production consisted of the total number of seats the two of them completed.

12. Biaggi testified that Arthur Gear burned on an average of ten to fifteen "bands" per day. Employee Denniston who had charge of the "bands" testified that there was only one occasion when it was necessary for Arthur Gear to come

to him for a replacement of "bands," and that Biaggi had told him shortly after Edward Gear was hired that he was pleased with the way the Gear brothers were shaping up. This corroborated Arthur Gear's testimony that he had only burned one "band."

Banding is accomplished by a machine which "includes gluing the edge of the wood and taking a piece of formica and placing it on top of the area," and then by applying heat which "cooks the glue and in that way it adheres the formica to the edge."

the Board could reasonably infer that the refusal of Dunnell to continue as a company informer, coupled with his union activity, weighed more heavily in respondent's decision to discharge him.[13]

A decree will be entered enforcing the order of the Board.

13. See footnote 11, supra.