**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**Samuel B. GASS et al., Respondents.**

**No. 6793.**

United States Court of Appeals
First Circuit.

Heard March 7, 1967.

Decided May 5, 1967.

Allison W. Brown, Jr., Washington, D. C., Atty., with whom Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and William J. Avrutis, Atty., Washington, D. C., were on brief, for petitioner.

Irving Isaacson, Lewiston, Me., for Samuel B. Gass, respondent.

Courts Oulahan, Washington, D. C., with whom Charles S. Rhyne, Alfred J. Tighe, Jr., Washington, D. C., Benjamin P. Lamberton, III, and Rhyne & Rhyne, Washington, D. C., were on brief, for Lipman Bros., Inc., et al., respondents.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

McENTEE, Circuit Judge.

This is a petition to enforce an order of the National Labor Relations Board issued against the respondents, Gass and Lipman, based on Board findings that these respondents engaged in certain unfair labor practices. The case arises out of the alleged unlawful discharge of a long time Gass employee. From this charge other issues developed upon which the Board made additional unfair labor practice findings, all of which are hereinafter discussed.

The pertinent background facts are as follows. The Lipmans are in the poultry business with principal places of business in Augusta and Winslow, Maine. They raise, process and sell poultry on a large scale through the medium of seven corporations. These corporations are controlled by three brothers, Bernard, Frank

and Harold Lipman. Respondent Samuel B. Gass, a Maine corporation (hereinafter Gass) is a trucker with a principal place of business in Augusta. It is a family corporation in which one Sam Gass is president and his wife is treasurer. Mrs. Gass is a sister of the Lipman brothers. Actually Gass has only one customer—Lipman—and most of the time is engaged in hauling poultry feed from Lipman's feed mill in Augusta to some 150 to 200 poultry farms within a general fifty mile radius where Lipman raises its chickens.[1] Gass operates nine specially equipped delivery trucks and employs seven drivers, a mechanic and a mechanic-driver. From this business it grosses in excess of $100,000 a year.

Miville, the discharged employee in question, was one of these seven drivers. In August 1964 he and another driver succeeded in getting all nine Gass employees to sign union authorization cards. On the day that the last of the drivers signed up, (August 19), one Morgan, the superintendent of the Lipman feed mill in Augusta, heard about this union activity. He contacted Sam Gass and immediately tried to discourage it.[2] The next day (August 20) the following occurrences took place. Early that morning Harold Lipman discharged Miville, ostensibly for other than union reasons.[3] When Miville remarked that he was really being fired on account of his union

activities, Harold replied "You didn't have to sign the papers," meaning the union papers. Then Harold asked Miville how many Gass drivers had signed up with the union and when Miville told him they had signed up "one hundred per cent," Harold Lipman angrily remarked "I'm taking the trucking outfit over." After rebuking Miville he ordered him off the Lipman property. Also on that day Gass received written notice from the union[4] stating that it represented a majority of the employees and demanding collective bargaining rights. Shortly afterwards Sam Gass showed this notice to one of the Lipmans. On this same morning Miville brought one Hastings, the president and business agent of the union, to the truck terminal to see Sam Gass about Miville's job. Sam was not available at the time but they were confronted by Mrs. Gass who, when she learned who Hastings was, subjected him to a strong outburst of antiunion animus and ordered him off the premises. An hour or so later Miville telephoned Sam Gass to try to arrange a conference between him and Hastings. At that time Mrs. Gass broke in on the telephone conversation and again expressed strong antiunion feelings.[5] At the end of this conversation when Miville asked Sam Gass whether he (Miville) was "all through" Sam replied "Lipman don't want you on the farm. I

1. Lipman owns ten of these farms. The rest are leased from farmers who are engaged by Lipman to raise the chickens as part of their lease arrangement. Lipman retains title to the chickens, supplies the feed, etc.

2. Following the conversation with Sam Gass, Morgan told two of the drivers that Sam Gass knew what the employees were up to; that he (Morgan) thought they had jumped into the union too quickly and should have first talked it over with Sam Gass. Later that day signs were posted at the feed mill where the Gass drivers loaded up their trucks daily and while there used the rest room facilities and vending machines, that the mill facilities were now "off limits" to them.

3. As Miville was about to start work, Sam Gass told him that Frank Lipman wanted

him off the Lipman property and also wanted to see him that morning at the feed mill for using vulgar language to him a few days before in the presence of others. When Miville went to the mill looking for Frank, his brother Harold replied that he would take care of him and told him he was "all through." The reason given to Miville for this action was "You've been shooting your mouth off at my chicken farmers and been fooling [with] women on the farms."

4. Truck Drivers Warehousemen and Helpers Union Local No. 340 affiliated with the International Brotherhood of Teamsters, etc.

5. She stated "We don't want to talk to no union man. We don't want no union man around here."

have no more work for you." That afternoon Sam Gass informed his truck drivers he was losing his business and that their employment would end as of the following day.[6]

The next morning, Friday, August 21, one of the Gass employees told Morgan he had heard that Sam was losing his business and asked what would happen if the drivers withdrew from the union. Shortly thereafter word came back through Morgan that if the drivers got together with Sam Gass before 5 o'clock that day and "get this straightened out" the Lipmans "would give him back his business." Thereupon a hurried conference was called at which the truck drivers, Mr. and Mrs. Gass and Morgan, were present.[7] As a result of this meeting the drivers agreed to withdraw from the union and Gass continued operating the business.[8] That afternoon two drivers approached Sam Gass about Miville getting his job back now that they had withdrawn from the union. Sam stated he would do all in his power to have Miville reinstated but added that he didn't know if the Lipmans wanted Miville back.

The following Monday, August 24, Sam Gass offered Miville his job back "under the old conditions" but Miville replied that he would come back to work only if he "could talk freely with the boys about a union." Sam said "under those circumstances I have no work for you" and hired a new driver who was there seeking employment at the time.

Some two weeks later Miville received a letter from Gass' attorney stating he was authorized to offer him "immediate and unconditional reinstatement" to his job nothwithstanding he had twice refused reemployment. Upon receipt of this letter on Friday, September 10, Miville went to the terminal and in the absence of Sam told Mrs. Gass he was reporting for work in accordance with the letter. She informed him that a truck would not be available until the following Monday, whereupon Miville left. In a matter of minutes Mrs. Gass appeared at the office doorway to the garage where Miville had stopped to visit and told him she wouldn't have him or anyone else swearing or insulting her— and threatened to fire him then and there. Miville denied that he swore at or insulted Mrs. Gass. At any rate, the next day he received a telegram from Sam Gass discharging him for "insubordination and profanity to Mrs. Gass" on the previous day. At no time thereafter was Miville offered reinstatement in his job.

On the basis of the above evidence the Board found that the Lipmans were engaged in a single integrated enterprise; that Lipman and Gass were joint employers of Miville and as such discriminatorily discharged and refused to reinstate him in violation of section 8(a) (3) and (1) of the Act; that through respondents' coercive interrogation and threats of going out of business the Gass drivers were coerced into abandoning their union membership in violation of said section 8(a) (1); and finally the Board found that the respondents refused to bargain with the union in vio-

6. The business arrangement between Gass and Lipman was oral and could be cancelled at the will of the latter.

7. At this meeting the employees told Mr. and Mrs. Gass that they had talked with Morgan and indicated they would like to straighten things out and get back to normal. Mr. and Mrs. Gass said that the drivers had to send the union a registered letter and a telegram signed by all of them, withdrawing from the union. A letter was then composed by one of the drivers with the help of Sam Gass and was signed by all the drivers and taken to the post office where it was registered and mailed. From there the drivers went to the telegraph office where each driver signed and sent a telegram to the union. This whole affair took about three hours working time but this loss of time was not deducted from the drivers' pay.

8. Later Morgan told one of the drivers that if they had not withdrawn from the union when they did, they would have been working for him the following Monday under far more restrictive rules relating to coffee breaks and other privileges previously extended to the Gass drivers at the feed mill.

lation of section 8(a) (5) and (1) of the Act. It also rejected the respondents' contention that the Gass drivers are agricultural laborers and hence exempt from the Act.

Broadly, the respondents resist enforcement of the Board's order because they contend that none of these findings are supported by substantial evidence. In particular, the respondents vehemently press their contentions that they did not employ and were not joint employers of Miville; that Lipman is not a single integrated enterprise and that the Gass drivers are agricultural laborers and by reason thereof are exempt under section 2(3) of the Act.

 It is now so well settled as not to require citation of authority that this court's function on a petition to enforce an N.L.R.B. order is merely to determine whether on the record as a whole there is sufficient evidence to support the Board's findings. We think there is substantial evidence to support the Board's findings. To begin with, we call attention to the fact that on a previous petition to enforce an order of the Board against the Lipmans, decided by this court some fifteen months ago, the Lipman corporations admitted and this court found that this same poultry operation was a single integrated enterprise. N. L. R. B. v. Lipman Brothers, Inc., 355 F.2d 15, 21 (1st Cir. 1966). There is no evidence before us of any change in the corporate set-up or modus operandi of this business in the relatively short period since this admission was made. Although this finding does not bind the respondent Gass, it not being a party to

the earlier case, we see no reason why we cannot take judicial notice of this admission and of our findings based on it, as far as the respondent Lipman is concerned; and we do so notice this earlier finding. Quite apart from this admission in the earlier case, there is substantial evidence in the record before us that Lipman is a single integrated business enterprise. As above stated, the three Lipman brothers are still the only officers and directors of all seven corporations in question. Together these three brothers own the controlling interest in each of them. From an examination of the part these corporations play in the overall operation of this business, and from the division of responsibilities between the three Lipman brothers—apportioned without regard to corporate lines, it is clear that this is but one large integrated poultry business—not several businesses.[9]

 Also, we think there is substantial evidence in the record to support the Board's finding that Lipman and Gass were joint employers of the Gass drivers and as such discriminatorily discharged and refused to reinstate Miville. It is evident that although Gass paid the drivers, Lipman held and exercised de facto control over Gass at least insofar as its drivers are concerned. The fact that Lipman could terminate its hauling agreement with Gass at will, plus the fact that Harold Lipman said he was going to take over the Gass trucking operation when he learned that all the Gass drivers had joined the union, demonstrates that Lipman was actually in complete control of the Gass trucking business. Furthermore, almost immediately

9. Five of the Lipman controlled corporations are engaged in the following activities which contribute directly to the final poultry product. Pinecrest Poultry Farms, Inc. hatches chickens and sells them to Lipman Poultry Farms, Inc., which grows these chickens and then sells them to Lipman Bros., Inc. The latter kills, dresses and sells the dressed poultry on the market and sells the by-products to By-Products, Inc. This corporation processes these by-products and sells them to Samuel Lipman Sons, which

uses them in making poultry feed which it sells to Lipman Poultry Farms, Inc., that in turn feeds it to the chickens being raised on the various farms.

Also, all three Lipman brothers are actively engaged in the day to day Lipman operations which are divided between them, as follows: Bernard has charge of sales; Frank supervises the feed mill and the raising of chickens and Harold looks after the rolling stock, plant maintenance and the production of the dressed poultry.

after learning of the successful union effort led by Miville in signing up the drivers, Lipman embarked upon a campaign of harassment against them and against Miville in particular. This clearly showed antiunion animus on the part of Lipman. Morgan, the superintendent of its feed mill, was critical of the drivers' actions in joining the union. Lipman immediately declared the facilities of this mill "off limits" to Gass drivers, which restrictions were removed when the drivers renounced their recently acquired union membership. Finally, Gass and Lipman both "pulled the rug", so to speak, on all the Gass drivers by threatening that Gass was then and there going to cease doing business, obviously because the Gass drivers joined the union. What better evidence is needed of antiunion animus and coercion?

It is also significant, we think, that Harold Lipman—not Sam Gass—discharged Miville and it was primarily Lipman's opposition that kept this discharged employee from being reinstated even when Sam manifested a desire to rehire him. Moreover, the events immediately preceding the August 21 meeting at which the drivers agreed to withdraw from the union, further show that in fact Lipman was in control of the Gass trucking operation and for all practical purposes was a joint employer of these drivers. Lipman also directed their daily operations from the feed mill. It was only after the Lipmans had sent word that they would give back the business to Gass on the condition that the matter was "straightened out" that the union withdrawal meeting took place. Obviously the "straightening out" meant renunciation by the drivers of their union membership.

■ The Board could conclude very reasonably from the facts recited above that the renunciation demanded by Sam Gass and his wife was dictated by Lipman. Such conduct is unlawful. N. L. R. B. v. Yale Manufacturing Company, 356 F.2d 69, 72 (1st Cir. 1966).

■ Without repeating the evidence previously mentioned, suffice it to say that we are also of the opinion there was ample evidence that Miville's discharge was motivated by the fact that he was the prime mover in getting the drivers to join the union. We are convinced that his alleged use of vulgar or abusive language to Frank Lipman and to Mrs. Gass were mere pretexts and not the real cause for his discharge or for his failure to be reinstated. The substantial evidence points to Miville's union interest and activity as the real reason behind both. Furthermore, we think that from her conduct, the Board could reasonably conclude that Mrs. Gass' opposition to Miville's reemployment stemmed from her fear of renewed union activity. As we said in *Lipman,* supra "In evaluating these discharge situations the pivotal factor is motive" and "the mere existence of a valid ground for discharge is no defense to an unfair charge if such ground was a pretext and not the moving cause."

■ Sam Gass' refusal to talk with the union, Gass' failure to acknowledge receipt of the union's demand for collective bargaining and its refusal to contact or talk with the union, as well as the part both Lipman and Gass played in bringing about the drivers' withdrawal from the union, certainly is sufficient to support a finding that the respondents refused to bargain in violation of section 8(a) (5) and (1) of the Act.

■ The respondents attack the credibility of some of the General Counsels' witnesses. In this connection we point to what we said in N. L. R. B. v. Universal Packaging Corporation, 361 F.2d 384, 388 (1st Cir. 1966) "that questions of credibility are for the Board, subject to judicial review only when the Board oversteps the bounds of reason. We shall not substitute our judgment for that of the trial examiner who heard the testimony and observed the witnesses, nor for that of the Board with its vast experience in dealing with labor disputes."

■ The contention that the Gass drivers were "agricultural laborers"—

and hence not subject to the Act [10] does not impress us. The Supreme Court has held that the definition of agriculture has two distinct branches. Primarily, it includes farming in all its branches, i. e., cultivation, tillage of the soil, dairying, etc. But it also has a broader meaning which "includes any practices, whether or not themselves farming practices, which are performed either by a farmer or on a farm, incidentally to or in conjunction with 'such' farming operations." Farmers Reservoir & Irrigation Co. v. McComb, 337 U.S. 755, 763, 69 S.Ct. 1274, 1278, 93 L.Ed. 1672 (1949). Respondents do not contend that the work performed by the Gass drivers in this case is farming. They do insist, however, that the delivery of the poultry feed is in large part work performed on farms and is incidental to the raising of poultry. In disposing of this contention we need only to point out that in Bowie v. Gonzalez, 117 F.2d 11 (1st Cir. 1941), and later in Calaf v. Gonzalez, 127 F.2d 934 (1st Cir. 1942), we held that the transporting of sugar cane from farms to a sugar mill was incidental to the work of the mill. Similarly, we think the delivery of the poultry feed in this case is incidental to the work of the feed mill—rather than the farms. The mere fact that the success of raising the chickens depends to a great extent upon trucking poultry feed to these farms, or the further fact that this work is sometimes done by farm laborers, does not make these drivers agricultural laborers. It is significant that these drivers are not employed or paid by the farms nor are they under the control of the farmers. It would also seem that the delivery of poultry feed here is much like the delivery of water or electricity to farms. See Farmers Reservoir & Irrigation Co. v. McComb, supra. Surely no one would seriously contend that this makes employees of these companies, who go on the farms in connection with their jobs, agricultural laborers—however long they work there.[11] Consequently, in our opinion the Board was amply justified in finding that the work of the Gass drivers was incidental to the operation of the feed mill rather than to the operation of any farmer or farm.[12]

Moreover, although we do not decide the question, even if these deliveries were incidental to farming we doubt that the physical presence of the drivers on the farm premises, while such deliveries are being made, is the kind of activity that Congress intended would qualify them for this exemption.

Finally, on the record before us, we find no error in the scope of the Board's order. The evidence was sufficient to warrant the finding that Gass and Lipman were joint employers and therefore the order covering both is justified. We do not interpret this order as imposing any unwarranted hardship on the respondent Lipman. All other points raised by the respondents have been considered and found to be without merit.

A decree will be entered enforcing the order of the Board.

10. Section 2(3) of the Act, 29 U.S.C. § 152(3) provides in pertinent part "The term 'employee' * * * shall not include any individual employed as an agricultural laborer * * *."

11. The record shows that at the farms it takes the drivers from an hour to an hour and a half to discharge the load of feed into the poultry house storage bins.

12. Respondents call our attention to Nix v. Farmers Mutual Exchange of Calhoun, 218 F.2d 642 (5th Cir. 1955) and Mitchell v. Georgia Broiler Supply, Incorporated, 186 F.Supp. 341 (N.D.Ga.1960). These cases are clearly distinguishable from the instant one on their facts and to the extent that Mitchell supports Gass we do not follow it.