NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

PIONEER PLASTICS CORPORATION,
Respondent.

No. 6860.

United States Court of Appeals
First Circuit.

Heard June 6, 1967.

Decided June 23, 1967.

**302**

Warren M. Davison, Atty., N.L.R.B., with whom Arnold Ordman, Gen. Coun-

sel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Stanley Lubin, Atty., N.L.R.B., were on brief, for petitioner.

Louis Chandler, Boston, Mass., with whom Alan S. Miller and Stoneman & Chandler, Boston, Mass., were on brief, for respondent.

Before ALDRICH, Chief Judge, Mc-ENTEE and COFFIN, Circuit Judges.

McENTEE, Circuit Judge.

■ In this case the National Labor Relations Board petitions us to enforce its order issued against the respondent employer, Pioneer Plastics Corporation. The order is based upon the Board's findings that during a union organizing campaign at its plant in Auburn, Maine, Pioneer engaged in certain antiunion activities proscribed by Section 8(a) (1) of the Act; also, that it discharged two employees because of their union activities and refused to reinstate two others —in violation of Section 8(a) (3) and (1) of the Act. Our only function here is to determine whether, on the record as a whole, there is substantial evidence to support these findings. N.L.R.B. v. Gass, 377 F.2d 438 (1st Cir. 1967). If so, the Board's order must be enforced.

The facts are not complicated and insofar as is practical we shall recite them in chronological order. Pioneer, a manufacturer of plastic laminates and related products, operates a manufacturing plant in Sanford, Maine. Its employees are represented by the Leather Workers International Union, AFL–CIO. In the spring of 1965 Pioneer opened a new plant in Auburn, Maine. Quite understandably, the union was anxious to become the collective bargaining agent for the employees at this plant and on August 4, 1965, one Quadros, the union representative, went to the vicinity of the Auburn plant for the purpose of actively starting the organizing campaign.[1]

1. Even before the Auburn plant opened, Quadros held several conversations with respondent's president and its personnel director in which he stated that his union intended to organize the new plant and requested recognition as bargaining agent. The president countered that it was "premature" to talk about the Auburn plant.

On August 9, at a meeting in Boston, the Leather Workers Union requested recognition on the basis of a card check—but respondent's president, one Aron, took the position that the company was not yet ready for a union in the Auburn plant. Quadros made it clear, however, that the union intended to continue with its organizing campaign at the Auburn plant. A week later (August 16) when Quadros was parked outside the company plant, Aron sent out the personnel director, one Trembly, to see what he was passing out that day. Later the same day Aron himself appeared on the scene. He and Quadros then went to a nearby restaurant and in the course of their conversation Aron suggested a deal under which the union organizing drive then in progress at Auburn would be discontinued. Not only did Quadros reject this proposed deal, but thereafter he stepped up the union's organizing efforts. On August 18, Quadros again went to the plant and while there arranged a union meeting to be held at a nearby gas station on the afternoon of August 23. Some fifteen employees attended this meeting, including Elsie Boston and Rebecca Gould. When a policeman broke up the meeting the group adjourned to Mrs. Boston's home where Karen Blaisdell and Barbara LeBel joined the meeting. We note that it was at this meeting that Quadros first met these four women employees whose activities, as we shall see, figure so prominently in this case. Two days later (August 25), Boston and Gould were discharged and when they left the plant Blaisdell and LeBel also left with them. On the next day Boston and Gould, together with Quadros and some other employees were stationed outside the plant for about two hours distributing union

literature and soliciting employees to sign union authorization cards. During most of this time a company supervisor watched their activities. In fact, at one point the president of the company drove up and made a disparaging remark to Quadros. Soon after he left, a police officer arrived and stayed until the group left. The policeman stated that he was there because there was a complaint they were "tying up traffic." On two other occasions in early September Trembly parked close by and watched a group of employees who were meeting with Quadros near the plant and passing out union literature.

Also, during this period the Teamsters Union [2] was actively engaged in organizing respondent's truck drivers and mechanics at the Auburn plant.[3] The traffic manager for the trucking division, one Libby, was a former member of the Teamsters Union. In late August when an official of this union remarked to Libby that it ought to be an easy job for the Teamsters to sign up the drivers, he replied in no uncertain terms that it was his job to keep the Teamsters Union out.

In October the Teamsters Union wrote to these employees urging them to join the union and inviting them to a union meeting on October 23rd. Hearing rumors of union activities, Libby called in a number of employees on the day of the scheduled union meeting and discussed this organizing effort individually with each one of them. The general manager of the company was also present at some of these discussions. Both of these officials made antiunion statements to the employees and Libby, in particular, made it crystal clear to them that his job was to keep this

**2.** Truckdrivers, Warehousemen and Helpers Union, Local No. 340, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

**3.** This case is somewhat unusual in that two distinct factual situations and two separate unfair labor practice charges by two different unions are involved. In accordance with the usual practice, these charges were heard originally by a trial examiner who made certain findings. The Board adopted these findings as its own and based its order upon them. Although respondent moved for a severance, this consolidation is a matter of convenience and there appears to be no prejudice as a result of hearing both charges together.

union out. He also outlined some drastic changes that were about to take place in trucking operations at the plant because of the union activities.[4] In October when one of the drivers asked Libby's assistant if he could have a Sunday run, he informed him that he couldn't promise anything because of the union's campaign.

■ We think this evidence amply supports the Board's findings (1) that respondent engaged in surveillance of the union activities of its employees at the Auburn plant; (2) that it coercively questioned the employees in the trucking division regarding their union membership and activities and also threatened reprisals and promised benefits to influence these employees not to join the Teamsters Union—all in violation of Section 8(a) (1) of the Act.[5]

We return now to the discharge of employees Boston and Gould and also the company's refusal to reinstate Blaisdell and LeBel. Boston and Gould worked in the buildup room of the plant where most of the union activity centered. Both had been repeatedly complimented by their immediate superiors for their good work. Boston was rapidly promoted and at the time of her discharge was the "lead girl".[6] At that time, some thirty girls worked in this room. Gould also went up the ladder fast and soon became a "ticket girl". At the request of these two employees four girls came from the Sanford plant on or about August 2 for the purpose of instructing the employees in the buildup room. A few days later Boston asked them how much pay they were getting in Sanford but received no reply. Thereupon, she asked the assistant plant manager and two supervisors for the name of the union at Sanford and was rebuffed by all three of them. Boston and Gould then began talking to their fellow employees about a wage increase and of the need for a union at the plant. Frequently two of their immediate supervisors were close by when these talks took place.[7] Soon thereafter (Friday, August 13), Trembly called both employees to his office and told them that their work was unsatisfactory, that they were "instigators",[8] and suspended them pending decision as to whether they would be discharged altogether. On the following Monday morning, Blaisdell and LeBel got together a protest group to talk to Trembly on behalf of Boston and Gould. That afternoon both were reinstated without loss of pay but were warned to keep their words to themselves. The very next morning their immediate supervisor again praised their work to date but cautioned them

---

4. For example, after inquiring from the first employee if he knew of any union activity around the garage, Libby told him that because of union activities all local hauling would be done by a separate hauling company; that all long hauls would be a single man operation as opposed to the present two-man system; that the drivers would be paid on an hourly instead of a trip basis; that mechanic work would be contracted out and that these changes would reduce the number of employees from eighteen to five. He then asked this employee if he wanted to be a long haul driver under the new system, which offer was refused. Libby told the several other employees substantially the same thing.

5. 29 U.S.C. § 158(a) (1).

6. As such, respondent contends that she was a supervisor and thus not covered by

the Act, but we find no merit in this contention. The record demonstrates that Boston merely assisted her foreman in the buildup room, did some paper work, took inventories and relayed orders. Also, she assisted the other girls and answered questions but she had no real discretion and had no authority to hire, discharge, discipline or assign employees. She was paid on an hourly rather than a salary basis and did not have certain other benefits afforded to supervisors.

7. Boston and Gould did this on their lunch hours, during coffee breaks and also in the buildup room itself.

8. When Mrs. Boston asked what they were investigating, the personnel director replied "you know what."

to be careful because the company was going to watch them. Despite these warnings, Boston continued to stress the need for a union with her fellow employees.

A few days later Boston was informed of the August 23 union meeting above mentioned, told Gould about it and each of them asked her supervisor for permission to leave early on that day.[9] At this meeting both of them signed union cards and it was agreed that another union meeting would be held at Mrs. Boston's home.[10] Two days after this meeting (August 25), Trembly called Boston and Gould to his office and discharged them. He gave as his reasons—unsatisfactory work and lying about where they were going when they asked permission to leave early on the 23rd. He gave no indication, however, that he knew the real reason.[11]

Blaisdell and LeBel also worked in the buildup room. They, too, had the reputation among their supervisors of being good workers. Boston had notified them of the August 23rd meeting which they attended after work and at which they also signed union authorization cards. On August 25 when Boston came from Trembly's office and told these girls that she had just been fired, both of them immediately took off their smocks and without saying anything, put them on the foreman's desk. When asked by some of the other girls why they had done this, they said they were leaving because "Boston had been fired for speaking about union (sic) in the plant." Also, they discussed a possible walkout with some of the male employees as a protest against Boston's discharge. After Gould was fired she joined the other three. A few minutes later a company supervisor told all four of them to get their checks and leave the plant.[12] The next day Blaisdell and LeBel tried without success to see Trembly who, incidentally, later the same day saw Blaisdell distributing union literature outside the plant. The following day they returned to the plant, met with Trembly, apologized to him for walking out with Boston and Gould; said they did it because they were "mad" and asked about getting their jobs back.[13] About a week later Trembly told LeBel he thought it best not to reinstate either her or Blaisdell.

On this record the Board found that the respondent employer discharged Boston and Gould because of their union activities in violation of Section 8(a) (3) and (1).[14] It also found that in walking off the job, Blaisdell and LeBel were engaging in a concerted refusal to work, in protest against these discriminatory discharges and for that reason the company's refusal to reinstate them also violated these sections of the Act.

9. Neither one gave the real reason for wanting to leave early. Boston said she had a dentist appointment and Gould represented that she had to go to the doctor. Instead, both attended the union meeting. The very next day a supervisor checked these excuses and found them to be false.

10. At work the following day, Boston talked about the meeting to a number of employees in the buildup room and asked them to attend the next meeting at her home. Gould also talked to some of the employees about the meeting of the day before and asked them to come to the next one. There is evidence that when Gould did this, her immediate supervisor was only about five feet away.

11. A few days later Boston and Gould returned to the plant asking to be rehired. Trembly told them he would talk it over with their supervisors and let them know. He added, however, that he did not want a union in the Auburn plant at that particular time. Shortly thereafter he told Boston he had decided not to rehire them.

12. Blaisdell and LeBel's checks were not ready but they waited for them and then, left the plant with Boston and Gould.

13. He told them their work records were very good but their jobs had been filled and he would look into the matter. It is interesting to note that during this conversation the personnel director showed the girls a union leaflet which he said he received and remarked that he wanted a couple of years without a union in the Auburn plant.

14. 29 U.S.C. § 158(a) (3) and (1).

To begin with, respondent asks us to reject as erroneous the credibility findings of the Board, particularly those with reference to the testimony of Boston and Gould. In this connection we point to what we said in N.L.R.B. v. Universal Packaging Corporation, 361 F.2d 384, 388 (1st Cir. 1966): "that questions of credibility are for the Board, subject to judicial review only when the Board oversteps the bounds of reason. We shall not substitute our judgment for that of the trial examiner who heard the testimony and observed the witnesses, nor for that of the Board with its vast experience in dealing with labor disputes." There is no basis for finding that the Board overstepped the bounds of reason in making these findings.

The discharge of Boston and Gould presents two critical questions: (1) whether respondent employer had knowledge of their union activities prior to discharging them, and (2) whether the discharges were motivated by these activities. Although there is no direct evidence that prior to their discharge, Pioneer knew of the union efforts of these two employees, both of them testified that the buildup room supervisors were within hearing distance on numerous occasions when they spoke to other employees about a union. While such conversations in and of themselves are not a sufficient basis to infer knowledge, there is additional affirmative evidence here which indicates a strong likelihood that in fact the respondent employer knew of their union activity.

It is clear that in early August this employer was very much aware of the Leather Workers organizing campaign at Auburn. On August 6, Boston inquired not only of the assistant plant manager but of two other plant supervisors as well, as to the name of the Sanford union. She failed to receive a satisfactory answer from any of them and thereupon both she and Gould began talking to the employees in the buildup room about a wage increase and the need for a union at the plant. On August 9, Gould's immediate supervisor approached her and asked if "the union from Sanford (was) going to get in up here." Also, when Boston and Gould were suspended on August 13, Trembly accused them of being "instigators." In reinstating them, Trembly said he would keep his eyes open and that they should keep [their] words to [them]selves. Furthermore, when they came back to work the next morning their immediate supervisor warned them to watch themselves because the company was going to be watching them. When Boston was fired, Trembly told her, among other things, that she "did not know how to keep [her] mouth shut." Later, when Boston and Gould asked Trembly for their jobs back, it is significant that he said he did not want a union at the Auburn plant at that time. These facts, coupled with the open union activity in which these two employees engaged during business hours, amply support the Board's conclusion that respondent knew of Boston and Gould's union activities.

The company suggests that because Boston and Gould met Quadros for the first time at the union meeting of August 23, which was just before their discharge, they could not have been engaged in union activities prior to that date. There is simply no merit in such a contention. Boston and Gould's union efforts need not have been in connection with this particular organizing campaign in order to constitute union activities.

Also, respondent strongly contends that there was good cause for discharging these two employees—poor work performance and lying to the company as to the real reason for wanting to leave early on August 23. As to the first reason, the credited testimony clearly shows that Boston and Gould were very good workers. Up through August 13 both girls were frequently complimented by their supervisors for the quality of their work. Boston started out as a "builder" and after five weeks was promoted to head ticket girl. A week later she became the lead girl

in the buildup room. Gould also started at the bottom and later became one of four ticket girls in this room.

 There is no doubt that the second ground given by the company is a proper basis for discharge. But as we stated in N.L.R.B. v. Lipman Brothers, Inc., 355 F.2d 15, 21 (1st Cir. 1966), "It is well settled that the mere existence of a valid ground for discharge is no defense to an unfair labor charge if such ground was a pretext and not the moving cause." It must be shown, however, that the improper motive—union activity—is the dominant reason for the discharge, N.L.R.B. v. Lowell Sun Publishing Company, 320 F.2d 835, 842 (1st Cir. 1963) (concurring opinion). From the evidence, we think the Board could reasonably infer that Boston and Gould's union activities weighed more heavily in respondent's decision to discharge them than the reasons given. This is particularly true in light of respondent's strong opposition to the union coming into the plant at that time, and the further evidence that although both Boston and Gould had on other occasions been granted permission to leave work early, their reasons were never questioned until August 23—in the midst of the Leather Workers organizing campaign. Also of significance is the fact that Boston's immediate supervisor felt that she was "best qualified" for the position of lead girl and that "she could do the work better than anyone else."

 There is no question that employees may spontaneously agree to cease work in protest against their employer's conduct toward fellow employees and that such concerted action is protected activity. N.L.R.B. v. Phaostron Instrument & Electronic Co., 344 F.2d 855 (9th Cir. 1965); N.L.R.B. v. Puerto Rico Rayon, 293 F.2d 941, 946 (1st Cir. 1961). Respondent recognizes this principle but argues in effect that it was never informed of Blaisdell and LeBel's reason for walking out and consequently did not violate the Act by refusing to reinstate them. Although no demand was made by either Blaisdell or LeBel that Boston and Gould be reinstated or otherwise they would leave, the circumstances were such that it is only reasonable to infer that respondent knew their reason. Cf. N.L.R.B. v. Washington Aluminum Co., 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962); N.L.R.B. v. Phaostron Instrument & Electronic Co., supra. The circumstances immediately surrounding this walkout, plus the fact that just a short time before, both Blaisdell and LeBel led a protest group on behalf of Boston and Gould, clearly show that their walkout was in protest of the discharge of their two fellow employees.

A decree will be entered enforcing the order of the Board.