NATIONAL LABOR RELATIONS
BOARD, Petitioner,
v.
UNIVERSAL PACKAGING CORPORA-
TION, Respondent.
No. 6669.

United States Court of Appeals
First Circuit.
June 3, 1966.

Gary Green, Washington, D. C., Attorney, with whom Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Robert A. Gian-

nasi, Washington, D. C., Attorney, were on brief, for petitioner.

Joseph W. Bartlett, Boston, Mass., with whom Birge Albright and Ely, Bartlett Brown & Proctor, Boston, Mass., were on brief, for respondent.

Before ALDRICH, Chief Judge, and McENTEE and COFFIN, Circuit Judges.

## OPINION OF THE COURT.

McENTEE, Circuit Judge.

This is an unfair labor practice case in which once again the National Labor Relations Board petitions us, under the statute,[1] to enforce its order issued against an employer for violations of the National Labor Relations Act.[2] The order is based on findings[3] that during a union organizing campaign at its plant in Bow, New Hampshire, the respondent, Universal Packaging Corporation, (the company) engaged in certain antiunion activities proscribed by Section 8(a) (1) of the Act; that it violated Section 8(a) (3) (4) and (1) by suspending two employees for union activities[4] and discharged three others for the same reason in violation of Section 8(a) (3) and (1) of the Act.

The facts in the case have a familiar ring. The company is engaged in the manufacture and sale of folding cartons. In mid December 1963 the union[5] began an organizing campaign at the plant. The company soon learned of this[6] and took immediate steps to resist it. On December 30 a plant foreman told a meeting of employees in his department there was no need for a union in the shop and if they wanted to form a committee they should do so among themselves without having "an outsider" come in. Later that day he told an employee no union was needed and added that he knew plants that had closed because of unions and this company could do the same thing. About the same time the plant superintendent told an employee who worked in the printing department that everyone in his department should work together as a team; that he didn't want anyone to "go astray" and that he was putting him in for a raise. Also, during the union organizing campaign several company supervisors repeatedly warned another employee who was a leader in the union effort, not to "mess with the union."

In March 1964 while the organizing campaign was still going on, the company granted its employees an additional paid holiday.[7]

The Board adopted the trial examiner's findings that by engaging in the conduct above mentioned, the company coercively threatened its employees and granted them benefits in violation of Section 8(a) (1) of the Act.

We turn now to the three discharges.[8] At this point it should be noted that there was credited testimony by one Agresti, a former plant superintendent, that as the union organizing campaign progressed he, the general manager and another plant superintendent, conferred together on what measures to take to combat the union organizational drive. He said they decided to get rid of employees engaging in union activity; that upon Agresti's

---

1. 29 U.S.C. § 160(e).

2. 29 U.S.C. § 158(a) (3) (4) and (1).

3. These findings were made originally by a trial examiner who heard the evidence and rendered a decision. The Board reviewed the record in that proceeding, adopted most of the trial examiner's findings and entered its order.

4. The company does not challenge this finding here.

5. United Papermarkers and Paperworkers, AFL-CIO.

6. An official of the company testified that on any day after union literature was distributed, "I could find my share anywhere in the plant." The union began distributing leaflets in front of the plant on December 30.

7. Fast Day, which in 1964 occurred on April 24, is an annual religious observance brought from Scotland by the colonists and is still observed in some New England communities.

8. Gene L. Marsh, Donald Drew and Robert W. Brock.

advice they decided "not to fire them just like that" but to "find something we could probably actually get them for." All three of the employees involved here were discharged during the union organizing campaign.[9] All were active union adherents from the beginning, had attended union meetings and had signed and solicited union authorization cards from fellow employees.[10]

Marsh was employed by the company for about two months. He worked as a bailer.[11] For the greater part of his employment he commuted thirty-six miles by automobile from home to work. During this period he was late four times and absent four other times. He testified that this was due to car trouble and that he had telephoned the company on most of these occasions until told by a superior he no longer had to do so. He never received any reprimands for his lateness or absences. On December 28 Marsh moved nearer to his work and was neither late nor absent for the remaining days of his employment. On December 27 he attended an important union organizational meeting at a nearby motel. This became known to the company and on January 2, 1964, he was called to the office of his superintendent who asked him if he had any problems and suggested that this meeting indicated that he must have some. His attendance record was then reviewed and the superintendent discharged him then and there. The reason given was tardiness and absenteeism, plus a refusal to guarantee he would continue to work for the company,[12] but in discharging Marsh the superintendent also discussed the union and commented that he wanted to keep any problems they had in the shop.

Drew, when discharged, had worked for the company as a case sealer for a period of about four months. Ostensibly he was discharged for speaking disparagingly about the company to a job applicant whom he knew. This was done in the presence of one of the plant superintendents. There was a conflict in the testimony as to just what Drew said and whether his remark was made facetiously, but the incident was reported to the plant management who, without any further investigation, issued orders that Drew be discharged. When Drew asked why he was discharged his foreman's only reply was that the shop did not need a union but he knew there were people in the shop trying to organize one. The foreman added that he had worked in union shops before and the union had never benefited him in any way. The record shows that Drew was one of the most ardent union supporters and that the company knew this.

Brock had worked for the company for almost a year as a folding and glueing machine operator. In that period he received three raises, the last one being less than two months prior to his discharge. During the first two months of 1964 a large number of boxes had been returned to the company by customers as defective. Most of these defective boxes were traced to Brock's shift but it was not shown that Brock's machine was responsible. There was evidence that contrary to instructions, Brock had run his machine at too high a speed and knew this would result in damage to the production. The reason given for his discharge was poor workmanship, which stemmed from the return of these defective boxes. Of the many employees in the plant who were concerned with the operation of these machines only Brock was discharged. Also, there was credited testimony that Brock's union activity was

9. Marsh was discharged on January 2, 1964; Drew on January 6, 1964 and Brock on March 20, 1964.

10. Brock was one of the first to sign such a card. Marsh distributed about twenty cards and Drew passed out about twenty-five union authorization cards.

11. His duties consisted of compressing, wrapping and binding scrap paper and cardboard. The job required no special training or skill.

12. He testified that when asked if he would stay with the company he said if he could make enough money he would. The trial examiner specifically discredited this reason for discharge.

one of the reasons for his termination. Brock himself testified that in January and February of 1964 officials of the company knew he was a strong union man and admonished him on numerous occasions not "to mess with the union"; that the union wouldn't do him any good and "just to stay away from it."

Upon the basis of this evidence the Board adopted the trial examiner's findings that these three discharges were discriminatorily motivated; that the reasons given for them by the company were mere pretexts and that the real reason was union activity. Thereupon the Board ordered the company to reinstate these three employees with back pay plus interest.

■■ It is too well settled to require citation here that this court's limited function in these cases is merely to determine whether on the record as a whole there is substantial evidence to support the Board's findings. As to the findings of unlawful interference with the union organizing campaign, there was ample evidence that the management of the company was opposed to the union coming in to organize the plant; that they wasted no time in saying so and in taking steps to counteract the union organizing effort. It is also clear that at the outset, company officials knew which employees were union leaders and during this union organizing period singled out some of them for specific warnings. It was evident from a speech made to the employees by the president of the company just before the scheduled union election that he was vehemently opposed to the union and said that one strong union employee had already seen the error of his ways and he hoped to convert another union enthusiast whom he also mentioned by name. In addition, there was evidence from which the Board could and did reasonably conclude that two employees who were known union leaders, had been suspended because they testified for the union on its representation petition at a Labor Board hearing in Boston.[13] There

is the evidence that during the union campaign one union leader was promised a raise and all employees were granted an additional paid holiday. Such employer interference with a union organizing campaign violates Section 8(a) (1) of the Act. NLRB v. Exchange Parts Company, 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964); NLRB v. Lowell Sun Publishing Co., 320 F.2d 835 (1st Cir. 1963). From our examination of all the evidence we think the quantum of proof required to sustain the Board's findings on this charge has been amply met.

■ Also, from our examination of the record it is our opinion that there is sufficient evidence to support the Board's finding that the three discharges in question violated Section 8(a) (3) and (1) of the Act. While the reasons given by the company for these discharges in and of themselves could be valid, the Board found that under the circumstances here they were mere pretexts. As we recently stated in NLRB v. Lipman Brothers, Inc., 355 F.2d 15, 21 (1st Cir. 1966), "It is well settled that the mere existence of a valid ground for discharge is no defense to an unfair labor charge if such ground was a pretext and not the moving cause." In evaluating these discharges company motive is important. There is ample evidence of antiunion animus on the part of the company. It is significant, we think, that all three employees were union leaders and were discharged during the very heat of the union organizing campaign. Surely, the credited testimony of former plant superintendent Agresti that early in the union campaign, top company officials had decided to get rid of the employees who were active in the union effort as soon as the company could find something they "could probably actually get them for," plus his further testimony that this was one of the reasons for Brock's discharge, lends strong support to the Board's findings. The company attacks the credibility of this and other testimony presented by the General Coun-

13. Although these suspensions are no longer an issue in the case, they are evi- dence of antiunion animus and company reprisals.

388

sel and asks that we reject it. In this connection we need only to point out that questions of credibility are for the Board, subject to judicial review only when the Board oversteps the bounds of reason. We shall not substitute our judgment for that of the trial examiner who heard the testimony and observed the witnesses, nor for that of the Board with its vast experience in dealing with labor disputes. NLRB v. Yale Manufacturing Company, 356 F.2d 69, 72, 74 (1st Cir. 1966).

There is no substantial basis for finding that the Board overstepped the bounds of reason in making its findings here. Conflicting testimony raises questions of credibility and gives rise to inferences. It is well settled that the Board has the right to draw inferences from the evidence and such inferences, if reasonable, are not to be set aside by the court. NLRB v. Lowell Sun Publishing Company, supra.

We feel that the inferences drawn by the Board with reference to the discharges were reasonable and that as above stated the Board's findings were supported by substantial evidence.

A decree will be entered enforcing the order of the Board.