**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SANDY'S STORES, INC., Respondent.**
**No. 7059.**

United States Court of Appeals
First Circuit.
July 18, 1968.

Lawrence J. Sherman, Washington, D. C., Attorney, with whom Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Janet Kohn and Nancy M. Sherman, Washington, D. C., Attys., were on brief, for petitioner.

Stuart Linnick, Mt. Vernon, N. Y., with whom Sidney S. Wolchok and Katz & Wolchok, New York City, were on the brief, for respondent.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

COFFIN, Circuit Judge.

This case is before us on a petition by the National Labor Relations Board for enforcement of its order directing respondent Sandy's Stores, Inc. to cease and desist from certain violations of sections 8(a) (1) and (5) of the Act, 29 U.S.C. § 151 et seq., and to offer reinstatement to one Edyth Kearns, found by the Board to have been discriminatorily discharged in violation of 8(a) (3).

Local 1325, Retail Clerks International Association, AFL–CIO (union), began its organizational campaign at respondent's North Attleboro discount store in June of 1964. On August 25 it wrote to the company requesting recognition as bargaining representative of "all full-time and regular part-time employees * * * including leased departments, excluding supervisors, guards and professional employees" and asserted majority representation of such a unit provable by the several authorization cards it had solicited and collected in the preceding weeks. The company rejected the union's demand and contested the appropriateness of the unit. A representation hearing was held as a result of which the Regional Director found the unit appropriate, and, acting on an election petition filed by the union on

the same day it asserted its majority status to the company, directed that an election be held. The election, originally scheduled for December 4, was postponed on December 2 upon the filing of unfair labor practice charges by the union. In January the union withdrew its election petition altogether.

## 8(a) (1)

■ We hold that there is substantial evidence on the record as a whole to support the Board's 8(a) (1) findings and order. First, the president of Sandy's Stores addressed various shifts of employees during the latter part of June, well after the union's organizational campaign had begun, and announced changes in company personnel policy which, he conceded, included some newly instituted employee benefits. Although President Dushman testified that these benefits were introduced as a result of a broad reexamination of company employee policy, itself allegedly prompted by employee discontent over a recent unpaid Memorial Day holiday, the Board upheld both the Trial Examiner's refusal to credit Dushman's testimony, and his finding, amply supported by the record, that Dushman's speeches were designed to discourage employee endorsement of the union. Such conduct is clearly coercive within the meaning of 8(a) (1). NLRB v. Exchange Parts Co., 375 U.S. 405, 409, 84 S.Ct. 457, 11 L.Ed.2d 435 (1963); NLRB v. Universal Packaging Corp., 361 F.2d 384 (1st Cir. 1966).

Second, Department Manager Shea warned employee Riley that the store manager was going to fire him unless he stopped his union activity in the store. This the Board properly found to be coercive as a threat of reprisal for union participation. Editorial "El Imparcial," Inc. v. NLRB, 278 F.2d 184, 187 (1st Cir. 1960). Absent a showing by the company that Riley was engaged in impermissible union activity within the store, or that the company had promulgated a broad and justifiable no-solicitation rule applicable even to non-public areas, Shea's statement could be construed as overbroad and subject to Board attack.

Third, incidents such as Office Supervisor Hawksley's warning to employee Messier not to talk to union organizers because Store Manager Kannally had been observing her were properly found to be coercive as creating an "impression of surveillance". NLRB v. Prince Macaroni Mfg. Co., 329 F.2d 803 (1st Cir. 1964). Respondent's late denial of Hawksley's supervisory status is unsupported by the record.

Finally, the Board found that certain management-employee exchanges initiated by respondent's agents constituted coercive interrogations in violation of 8 (a) (1). All but one involved the coincidence of inquiry and implied promise of benefits. However, casual and unobjectionable any given question standing alone may have been, we are persuaded that when considered against the prophecy of increased benefits, the other 8(a) (1) violations generally, and the company's expressed anti-union animus, their total effect was to offend the intendment of the Act. See NLRB v. Sinclair Co., 397 F.2d 157 (1st Cir. 1968); cf. NLRB v. England Bros., Inc., 201 F.2d 395 (1st Cir. 1953).

## 8(a) (3)

The Board also found that respondent discriminatorily discharged employee Edyth Kearns in violation of the Act. Kearns was hired by a Sandy's Stores' supervisor but her salary was paid by Sullivan's Donuts, Inc., a concessionaire. While she was evidently principally employed to sell doughnuts, the record shows that she spent considerable time assisting respondent at its adjoining snack bar. In fact, according to Kearns' testimony, she was the only employee who covered the snack bar during the evening hours that she worked.

Store Manager Kannally testified that Kearns was "laid off" because he discovered that the stock of doughnuts was sold out by early evening so that there was no reason to keep her on. The Board

found that this was not respondent's motivation and concluded that Kearns was discharged because of her involvement in union activities. The record substantially supports this result. If doughnut sales were so active that demand outran supply, we would have supposed the reasonable response would be to increase the supply rather than fire the saleslady. In any case, Sandy's Stores had no economic interest in reducing or eliminating the salary expense incident to Kearns' employment. She was on Sullivan's payroll, not Sandy's Stores'. In fact, crediting Kearns' testimony that when she worked she worked alone and covered both the doughnut concession and respondent's snack bar, the company could only stand to lose by her discharge for if the snack bar was to remain open it would obviously have to be staffed, and this probably at company expense. Also the record discloses that while Kannally testified that he "laid off" Kearns because her product was sold out (no doughnuts, no dough), he told Kearns only that she was discharged because "Sullivan was letting [her] go" and that he did not know why. According to Kearns, however, Mrs. Sullivan explained that it was Sandy's Stores, not Sullivan's, that was dissatisfied with her services. Finally, it is clear from the evidence that Kearns was a union sympathizer and that the company believed her to be an important source of information to the non-employee union organizers.

 Recognizing that the credibility of witnesses is for Board determination, NLRB v. Lowell Sun Publishing Co., 320 F.2d 835, 840 (1st Cir. 1963), we think it entirely appropriate in this case for the Board to have drawn from its evaluation of Kannally's testimony and other record evidence the inference of an improper motivation for Kearns' discharge. NLRB v. Bird Mach. Co., 161 F.2d 589, 592 (1st Cir. 1947).

### 8(a) (5)

Coming to the refusal to bargain issue, we take preliminary note of the tenuous posture of this aspect of the case. The charge was dismissed on February 8, 1965. Upon reconsideration it was reinstated. The Trial Examiner, after hearing, concluded that the unit comprised some ninety-six employees and that valid authorization cards numbered forty-six, or less than a majority. Hence, no 8(a) (5) violation. The Board, however, found on its own review of the record that the unit comprised ninety-seven employees and that the union had obtained forty-nine valid cards, or a one-card majority.

To uphold the Board's determination that the union has a one-card majority, we would have to affirm two Board reversals of the Trial Examiner on eligibility, two reversals on the validity of card authorizations, and six findings of validity of cards not considered by the Trial Examiner. While we need deal with only one determination as to eligibility, there is at least one other which would give us difficulty. Moreover, affirmation of the card authorization findings would require reliance in the most mechanical sense on the *Cumberland* rule, an approach rejected by a number of other circuits and, we think, not necessarily commanded in the instant case by our own remarks in NLRB v. Southbridge Sheet Metal Works, Inc., 380 F.2d 851 (1st Cir. 1967). That the Board in March 1967 saw fit to reverse the Trial Examiner's dismissal of the 8(a) (5) charge a year earlier on conduct which had taken place two and one-half years earlier was of course within its power. But we question the practical wisdom of doing so when so many links of the chain of decision are so frangible.

The necessary predicate for the Board's 8(a) (5) decision is that the union was the designated bargaining agent of a majority of the eligible unit employees on the critical date. The undisputed critical date, August 26, 1964, marks the time of receipt by the company of the union's demand for recognition. We deal only with the finding that a Miss Ouimet was on the critical date "a regular part-time employee".

Jeanine Ouimet was first hired by respondent in December of 1963 while still a student in high school. Company records in evidence, although incomplete for the period through April of 1964, indicate that she worked most pay periods in May and June, all in July and August, some in September and October, most in November and one in December.[1] The only testimony that bears on Ouimet's employment comes from one Gilberte Hebert, who said that Ouimet was hired to take her place for the summer while she was on a leave of absence. Hebert further testified that Ouimet "was going to nursing school" in the fall; left in September upon Hebert's return;[2] "went to school"; and thereafter worked for the company "when she was able". The Trial Examiner concluded that Ouimet was hired as a summer replacement for Hebert and that her work thereafter was "at her convenience" and casual. She was excluded.

The Board, in its review, noted that Ouimet worked regularly from early May through the middle of September, and "that she resumed work the week of October 10, and, with the exception of two weeks, worked in every week through December 5." It, in effect, characterized her as a regular Saturday replacement for Hebert in the months preceding and following the summer season when she "worked as a full-time employee".[3] Dis-

agreeing with the Trial Examiner, the Board gave "little credence to the testimony of Hebert" as it related to Ouimet's status, concluded that Ouimet continued to work in the fall on a regular part-time basis, and included her in the unit. While conceding the wide range of discretion vouchsafed to the Board in eligibility matters, this nevertheless was error.

We begin with the rule that the availability of post-critical date information cannot be used to color the facts of a case as they stood on the critical date, NLRB v. Belcher Towing Co., 284 F.2d 118, 121 (5th Cir. 1960); that is, unless there is cause to believe that the subsequent and assertedly relevant events were contemplated beforehand, NLRB v. Joclin Mfg. Co., 314 F.2d 627, 633 (2d Cir. 1963). Likewise, we recognize that summer and casual part-time employment will not qualify as regular part-time employment. E.g., Dobbs Houses, Inc., CCH NLRB ¶ 9576 (1961); Kelsey Hayes Wheel Co., 85 N.L.R.B. 666, 675 (1949). Indeed, the Board's rule as to students is that those working for the summer with the intention of returning to school are ineligible to vote in an election. Pacific Tile & Porcelain Co., 137 N.L.R.B. 1358, 1364–65 (1962). This is so because as casual employees they do not share a "community of interest" with the other employees. Home Brewing Co., 124 N.L.R.B. 930, 932 (1959).

---

1. Her record of employment for each pay period was as follows:

| MAY | JUNE | JULY | AUGUST |
|---|---|---|---|
| 1 2 3 4 5 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 5 |
| * * * * | * * * | * * * * | * * * * * |

| SEPTEMBER | OCTOBER | NOVEMBER | DECEMBER |
|---|---|---|---|
| 1 2 3 4 | 1 2 3 4 5 | 1 2 3 4 | 1 2 3 4 |
| * * | * * * | * * * | * |

*Denotes pay periods worked.*

---

2. Company records show that Ouimet did not work the week that Hebert returned, or, for that matter, the two weeks after that.

3. It is not clear from the direct evidence whether Ouimet worked only Saturdays or other hours as well before and after her full-time summer employment. Notwithstanding, we think the record supports the Board's finding that her hours were confined to Saturdays.

▮▮ Viewing the evidence as it related to events on or before August 26, 1964 we have only company employment record sheets and Hebert's testimony. The former is inconclusive, for beyond the substantial void (December-April) there is information relating only to two pre-summer employment months and the two summer months up to and including the critical date. That this data strongly suggests Ouimet was a full-time summer employee is clear; she worked each pay period during July and the relevant portion of August. That it establishes *regular* part-time employee status before that time is less than clear; Ouimet missed the last week in May and the first week in June. While consistent employment but one day a week may be enough to satisfy the Board's "community of interest" standard, see e.g., Horn & Hardart, 147 N.L.R.B. 654, 658 (1964); Giordano Lumber Co., 133 N.L.R.B. 205, 207 (1961), we are persuaded that evidence of less than consistent Saturday employment, especially when absenteeism runs to twenty per cent of the work period involved, cannot sustain a finding of regular part-time employment without other evidence. See NLRB v. Greenfield Components Corp., 317 F.2d 85, 89 (1st Cir. 1963). Hebert's testimony fails to supply the missing link. If anything, it constitutes persuasive authority that Ouimet was a summer employee and no more.[4] If the latter intended to work on Saturdays on a regular basis we have no direct evidence of that fact nor evidence from which such an inference may be appropriately drawn.

Furthermore, even assuming that the circumstances of this case permitted us to examine the post-critical date evidence bearing on Ouimet's status, but see NLRB v. Joclin Mfg. Co., supra, we cannot say that it would repair the Board's case. Both the Trial Examiner, who excluded her, and the Board, which included her, were too generous in their account of her post-summer employment record. To be sure, Ouimet worked every Saturday but two from the week of October 10 through December 5. She did not work the last two weeks in September, however, or the first week in October or the last three weeks in December. While we might be willing to concede that Ouimet's employment terminated as of December 5, so that the remaining weeks of that month should not reflect adversely on the regularity of her overall employment, we see no basis for the Board's dismissing out of hand her three week absenteeism before October 10 while at the same time maintaining that she was all along—at least from the critical date forward—a regular part-time employee. The fact is that Ouimet worked in only seven of twelve post-summer employment weeks, or was absent over forty per cent of the time. Surely this portion of the record no more permits a finding that Ouimet was a regular part-time employee on the date in question than that considered earlier.

The Board's 8(a) (1) and (3) order shall be enforced. The 8(a) (5) order shall be set aside.

---

4. While the Board has the right to discount a witness' credibility, it may not do so for a reason which is impermissible. The Board stated as its sole ground for discrediting Hebert's relevant testimony "the fact that Ouimet worked every week except two between September and December * * *." Our textual discussion explains why we find this reason impermissible.