STONE & WEBSTER ENGINEERING
CORPORATION, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 75–1411.

United States Court of Appeals,
First Circuit.

Argued March 4, 1976.

Decided June 10, 1976.

---

462

David F. Zorensky, Washington, D. C., Atty., with whom John S. Irving, Jr., Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Aileen Armstrong, Atty., Washington, D. C., were on brief, for respondent.

ON PETITION FOR REVIEW AND CROSS–APPLICATION FOR ENFORCEMENT OF AN ORDER OF THE NATIONAL LABOR RELATIONS BOARD

Before ALDRICH, McENTEE and CAMPBELL, Circuit Judges.

McENTEE, Circuit Judge.

In a decision dated April 28, 1975, an administrative law judge of the National Labor Relations Board found that Stone & Webster Engineering Corporation had engaged in certain unfair labor practices in violation of § 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. § 151 *et seq.* ("the Act"). She issued a cease and desist order and also ordered the reinstatement of the eight complainants. The decision and order of the administrative law judge was adopted by the Board with a relatively minor modification, 220 N.L.R.B. No. 124, and this appeal followed.

The disputed conclusions of the administrative law judge may be summarized as follows:

1. The termination on August 2, 1974, of eight named employees—the complainants before the Board—was effected by Stone & Webster "in order to discourage membership in and activities on behalf of the Union"[1] and constituted discrimination "against employees in regard to their hire or tenure of employment" and therefore was an unfair labor practice within the meaning of § 8(a)(3) and (1) of the Act.

2. "By following employees in the plant to prevent employee conversations

William G. Meserve, Boston, Mass., with whom John V. Woodard and Ropes & Gray, Boston, Mass., were on brief, for petitioner.

---

1. Boston Local No. 300 and Boston Local No. 16–B, Graphic Arts International Union, AFL– CIO, are referred to as "the Union" throughout this opinion.

about the Union" and "by maintaining surveillance of the conversations and activities of employee Union organizers," Stone & Webster interfered with, restrained, and coerced its employees in the exercise of their § 7 rights and thereby engaged in unfair labor practices within the meaning of § 8(a)(1) of the Act.[2]

We deal with these two sets of conclusions in order.

Stone & Webster is a large engineering firm with many employees in Boston and in other parts of the country. It is engaged in the design and construction of heavy industrial projects including nuclear power facilities. Because of the importance of reports, drawings, and specifications to its work, it maintains several "reproduction departments" in Boston and elsewhere. One such reproduction department was established at 401 Summer Street in Boston in January, 1974. At this facility, Stone & Webster employed some 85–90 people before the contested terminations. All the events which constituted the background of this case involved only the Summer Street facility.

On or about July 22, 1974, certain Stone & Webster employees at the Summer Street location decided that they wanted union representation, contacted a Union representative, and began an organizational campaign.[3] On Friday, August 2, ten employees at the Summer Street facility were informed[4] that, effective immediately, their employment was terminated. The Union charged Stone & Webster with an unfair labor practice in dismissing eight of these ten employees, noting that all eight had participated, in varying degrees in the union organizational campaign. The company maintained that the terminations were simply the result of a necessary reduction in its

workforce and did not represent antiunion discrimination.

The basic issue in this dispute is whether these terminations were the result of a business judgment based on economic necessity or of an impermissible decision to snuff out incipient unionism through a show of force. The administrative law judge and the Board concluded that Stone & Webster's economic justification for these terminations was not persuasive. As in all cases where motivation must be assessed, there is no substitute for close scrutiny of the factual context in which the disputed actions occurred.

 Our standard of review in considering the conclusion of the administrative law judge and the Board that the complainants were terminated in order to discourage membership in or activity on behalf of the Union is that of substantial evidence. "[T]his court's limited function . . . is merely to determine whether on the record as a whole there is substantial evidence to support the Board's findings." *NLRB v. Universal Packaging Corporation*, 361 F.2d 384, 387 (1st Cir. 1966). In making this determination, however, we must be mindful of the burdens of proof which the law imposes on the Board in cases of this nature. In the first place, the Board has the burden of showing that the employer had knowledge of the union activity. *NLRB v. Gotham Industries, Inc.*, 406 F.2d 1306, 1310 (1st Cir. 1969). If the Board sustains that burden, it then has the burden of "affirmatively show[ing] that the discharges were improperly motivated." *NLRB v. Patrick Plaza Dodge, Inc.*, 522 F.2d 804, 807 (4th Cir. 1975). In the event that the employer had a permissible reason for discharging the employee (e. g. economic considerations) and an impermissible reason (antiunion animus), "the Board must show an 'affirmative

---

2. The administrative law judge also found that Stone & Webster had violated § 8(a)(1) "by promulgating and enforcing a rule prohibiting conversations about the Union during working hours for the purpose of discouraging Union membership and activities." The Board, however, did not sustain this part of the administrative law judge's decision.

3. This campaign ultimately resulted in an election on September 19, the results of which have been challenged but are not before us on this appeal.

4. Some of the affected employees were on vacation on August 2 and were informed of their discharge either by mail or personally upon their return from vacation.

and persuasive reason why the employer rejected the good cause and chose a bad one.'" *Id.*, quoting *NLRB v. Billen Shoe Co.*, 397 F.2d 801, 803 (1st Cir. 1968). *See also NLRB v. Fibers International Corp.*, 439 F.2d 1311, 1312 & n. 1 (1st Cir. 1971).

 While we give due weight to the privileged vantage point of the administrative law judge as the fact-finder and also to the Board's "vast experience in dealing with labor disputes," *Editorial "El Imparcial," Inc. v. NLRB*, 278 F.2d 184, 187 (1st Cir. 1960), we simply are not persuaded that in this case the Board has sustained its burden[5] as to improper motivation.[6]

At the hearing before the administrative law judge, there was testimony by F. Lawrence Doherty, vice president and senior personnel manager of Stone & Webster, that economic considerations had required the company to effect a reduction in force in the Summer of 1974:

"In the investor owned electric power generating industry there have been very very substantial commitments made financially to finance large nuclear power stations, and some fossil and hydroelectric power stations.

"As we came to the end of the first half of 1974 these companies encountered some difficulties in not only obtaining new financing for new projects; but continued financing for projects they already committed themselves to in contracts with companies like Stone & Webster Engineering Corporation; and this was true even at the exorbitant interest rates that were being charged by the lenders at that time.

"This is a matter of public knowledge. This has been discussed in the Wall Street Journal; discussed in the professional trade journals; the New York Times; and I've read articles about it in the Boston newspapers. The information is in the public domain.

"Early in July 1974 Savannah Electric Company asked us to stop work on a fossil power station known as Effingham I, and by stopping work that meant to discontinue all engineering; all design; and procurement which had impact on the work of the reproduction department.

"On July 9, 1974 Niagara Mohawk Power Company directed us to slow down engineering; design; and construction; and purchasing work on a plant we are constructing for them known as Nine Mile II.

"Nine days later on July 18, 1974 the same company, Niagara Mohawk, instructed us to stop work and discontinue all expenditures on another fossil plant we're doing for them known as Oswego VI."

Mr. Doherty's testimony continued in the same vein, referring additionally to stop and slow orders received from other clients such as Long Island Lighting Company (two nuclear power projects) (July 24, 1974) and Virginia Electric and Power Company (six nuclear power projects) (July 24, 1974). He testified that the estimated completed construction cost for the projects on which they had received stop and slow orders by July 24 was $3,000,716,207. Mr. Doherty testified that, as a result of this situation, Stone & Webster "went from a company that was terribly short of technical professional support manpower almost overnight to a company that had too much manpower" and consequently a decision was made on July 24 that some reductions in force would have to be made. Mr. Doherty also testified concerning terminations actually effected by the company in several of its operations centers and construction sites in

---

**5.** This burden cannot be satisfied by suspicion or surmise. *NLRB v. Patrick Plaza Dodge, Inc.*, 522 F.2d 804, 807 (4th Cir. 1975); *NLRB v. Shen-Valley Meat Packers, Inc.*, 211 F.2d 289, 292 (4th Cir. 1954). It can, however, be satisfied by reasonable inferences.

**6.** Although the question of Stone & Webster's knowledge of the union organizational activity was hotly disputed, the administrative law judge did find that the company "had knowledge, before August 2, of the Union drive at the Summer Street location of the Reproduction department." Because of our resolution of the motivation issue, we need not pass on the accuracy of this finding.

various parts of the country. We need not quote in detail his testimony in this regard, but his summation is worthy of note: "In total, through the end of November starting with the 24th of July, we have terminated due to reduction of force 884 people in all locations or a total of 9% of our work force."[7]

Although this highly specific and empirical testimony was unrefuted, the administrative law judge found the testimony of [Stone & Webster's] witnesses "unconvincing" and "vague, inherently inconsistent, and contradictory"; she concluded that the company had failed to show "that these terminations were required by economic conditions." She went on to itemize some of the weaknesses which she saw in Stone & Webster's case:

"[Stone & Webster] introduced no original documentary evidence to show the economic need for these terminations. . . . Nor does the testimony adduced by [Stone & Webster] as to the stop and slow orders establish the economic necessity for the 8 terminations. . . . [Stone & Webster] presented no evidence as to new contracts obtained during this period; as to existing contracts that were unaffected by stop or slow orders; as to arrangements that were made to resume work on projects which [it] was committed by contract to complete by certain dates; or as to what impact, if any, these orders had on the specialized operations performed in the the Reproduction Department. . . .

. . . . .

"It is apparent, from the record as a whole, and I find that [Stone & Webster's] assertions that it terminated the employees here involved for economic reasons are unsupported by probative or credible evidence. . . ."

This evaluation of Stone & Webster's defense, however, reflects a misconception of the respective evidentiary burdens of the parties in cases of this nature. The Board has the burden of affirmatively showing improper motivation on the part of the company. *See NLRB v. Patrick Plaza Dodge, Inc., supra* at 807. But even "[w]hen the evidence of the charging party has raised a reasonable inference of discrimination, that inference may still be rendered unreasonable by the employer's excuse or justification . . . so that more evidence must be produced to establish the alleged discrimination." *NLRB v. Whitin Machine Works,* 204 F.2d 883, 885 (1st Cir. 1953) (citations omitted). In the instant case, Stone & Webster—through the testimony of Mr. Doherty—did present a substantial amount of basically unrefuted evidence as to the business reasons which they claimed motivated the decision to terminate these employees. It is true that Stone & Webster offered no original documentary evidence to complement the oral testimony. But it was not required to do so. *Sayen v. Rydzewski,* 387 F.2d 815, 819 (7th Cir. 1967); *Allen v. W. H. O. Alfalfa Milling Co.,* 272 F.2d 98, 100 (10th Cir. 1959); *Herzig v. Swift & Co.,* 146 F.2d 444, 446 (2d Cir. 1945) (Frank J.). Mr. Doherty was subjected to cross-examination; his testimony was not contradicted, and it was not inherently improbable. Under these circumstances, the administrative law judge's rejection of this important evidence concerning economic necessity was not justified. *White Glove Building Maintenance, Inc. v. Brennan,* 518 F.2d 1271, 1273–76 (9th Cir. 1975); *NLRB v. Ray Smith Transport Co.,* 193 F.2d 142, 146 (5th Cir. 1951); *Stone v. Stone,* 78 U.S. App.D.C. 5, 136 F.2d 761, 764 (1943). *See also Kelly v. Jackson,* 31 U.S. (6 Pet.) 419, 425, 8 L.Ed. 523 (1832). The Board neither directly challenged the accuracy of the evidence concerning economic necessity nor affirmatively showed that it was a cloak for actual discriminatory motivation.[8]

---

7. The total reduction by the end of November, including that resulting from attrition as well as termination, was 1762 people or 18% of Stone & Webster's workforce.

8. It should be emphasized that we by no means are implying that economic hard times give an employer carte blanche to engage in discrimination, under the guise of generalized reductions in the workforce. On the contrary, if a discriminatory motive coexists with a non-dis-

■■ The administrative law judge did point out several circumstances which she believed led to the inference of discriminatory motivation. In particular she noted: the fact that Stone & Webster advertised for new employees subsequent to the contested terminations; the precipitate manner in which the terminations were effected; and the failure of the company "to give those terminated any reasonably consistent explanation." But these facts, whether viewed jointly or in isolation, do not support an inference of discriminatory intent. The advertising was contracted for before the acuteness of the economic crunch was realized, and in any event no one was hired as a result of it; the news of the dismissals may have come as an abrupt shock to the employees concerned, but there was testimony that management officials had been contemplating such a decision for several days; and similarly there was unrefuted testimony, discussed *supra*, to support the company's explanation for the terminations—viz. a general reduction in force as a result of economic problems.[9] Having examined the entire record, we are unable to say that the Board had substantial evidence upon which to base a finding of improper motivation so as to rebut the business justification asserted by Stone & Webster.

■ As for the individuals actually selected for termination, we need not discuss in detail here the factual basis for each selection. Given our reading of the record as showing a company faced with the reasonable possibility of substantial loss of revenue and the Board's failure to prove discriminatory motivation in the decision to reduce the Summer Street workforce, it suffices for us to state that we are per-suaded that there were adequate business reasons used in the process of selecting those to be discharged. The company asserts that the principle criteria that it used were tardiness, absenteeism, poor productivity, and (to some extent) seniority. It is clear from the record that one or more of these traits characterized each of the complainants, to a greater or lesser degree. To be sure, if we had been making the selection at Summer Street we might have used different criteria or weighted differently the criteria actually used or more carefully scrutinized the personnel records—but that is not the norm for evaluating what Stone & Webster actually did. Absent proof of bad faith or discriminatory motivation, it certainly is not our role to second guess the business judgments of private companies. The Act was not intended to guarantee that business decisions be *sound*, only that they not be the product of antiunion motivation. *NLRB v. United Parcel Service, Inc.*, 317 F.2d 912, 914 (1st Cir. 1963).

We turn now to the two remaining § 8(a)(1) violations which were found by the administrative law judge and sustained by the Board. These were: (1) Stone & Webster's following of employees in the plant to prevent conversations about the Union; and (2) the company's surveillance of conversations and activities of employee union organizers in order to discourage membership in or activities on behalf of the Union.

■ The first of these findings is based on the undisputed fact that Roland Cunniff (one of the discharged employees and a union activist) was followed[10] by George Marsden (assistant manager of the reproduction department at Summer Street) when he returned to the plant on

criminatory motive, a discharge would be improper if the discriminatory motive predominates. *See NLRB v. Whitin Machine Works*, 204 F.2d 883, 885 (1st Cir. 1953).

9. It is true that the company had experienced "peaks and valleys" in the past and had not dismissed reproduction department personnel while in the valleys. While such evidence of past behavior is undoubtedly of some value in assessing subsequent action, that value is largely dependent on the similarity between the past occurrences and the present circumstances. Here the facility in question had only been in existence for seven months, and the company was confronted with a particularly steep economic downturn.

10. There is some dispute as to whether Marsden "followed" Cunniff or "accompanied" him as he moved about the plant on August 8. The administrative law judge used the verb "follow," but the point is irrelevant to our determination.

August 8 to clean out his locker.[11] Stone & Webster argues that Marsden followed Cunniff to prevent possible damage to valuable equipment by the discharged employee and that in doing so Marsden was adhering to established company policy. The administrative law judge, however, noted that such a policy had never been reduced to writing nor announced to employees and that not all terminated employees were followed in this manner; she concluded that the reason for Marsden's action was to prevent Cunniff from discussing the Union with the employees. In the light of our holding that the Board did not sustain its burden as to discriminatory motivation for the discharges, we do not believe that this conclusion can be sustained. Even if it were not in writing or consistently adhered to, there would be nothing inherently discriminatory in a company policy which permitted supervisors to decide on a case-by-case basis which discharged employees might be potentially disruptive and therefore merit close scrutiny during a post-discharge visit to the plant. Marsden's following of Cunniff strikes us as being within the scope of a legitimate business judgment and we do not believe that the record contains substantial evidence to support a finding that it was done to interfere with the exercise of the employees' § 7 rights.

 As for the remaining § 8(a)(1) violation found by the administrative law judge and sustained by the Board, which involved the company's alleged surveillance of the conversations of one Raia (a union organizer),[12] we note that the finding was based in large part on the unrefuted testimony of Raia. This testimony was summarized by the administrative law judge as follows:

"Raia's testimony is undisputed . . . that in one such instance [of supervisors' attempts to overhear his telephone conversations] he said to Genaris, a supervisor, that he did not like the idea of supervisors trying to overhear his conversations, to which Genaris replied, 'Well we don't want you guys calling the other building trying to solicit votes for the Union.' . . . "

The administrative law judge credited Raia's testimony and observed that it was unrefuted; on this basis and "on the totality of the evidence," she found that the supervisors had "maintained a close watch over employees, particularly Raia, for weeks preceding the election . . . [and] that this was not work-related but in order to discourage any conversation or other activity on behalf of the Union."[13] Because this finding is largely grounded on the fact finder's judgment concerning the credibility of the witness and on unrefuted testimony, we conclude that it was supported by substantial evidence and should not be disturbed.

*The Board's order is enforced with respect to the company's surveillance of conversations and activities of employee union organizers, but in all other respects the order is set aside.*

11. Cunniff did not receive notification that he had been terminated until his return from vacation on August 5. He returned to the Summer Street facility on August 8 for the purpose mentioned in the text.

12. The essence of the charge was that for about three weeks before the election, Raia's supervisors had maintained close surveillance over his activities and attempted to overhear his conversations on the pay telephone in the plant.

13. The administrative law judge implied that prior to the pre-election period employees had been free to use the telephone without interference. Raia's rights would not have been violated had there been, for example, a pre-existing rule against use of the telephone except in emergency situations.