**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SOUTH SHORE HOSPITAL, Respondent.**

**No. 77–1321.**

United States Court of Appeals, First Circuit.

Feb. 28, 1978.

Frederick Havard, Atty., Washington, D. C., with whom John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Michael S. Winer, Atty., Washington, D. C., were on brief, for petitioner.

Peter L. Resnik, Boston, Mass., with whom Herrick & Smith and Michael R. Brown, Boston, Mass., were on brief, for respondent.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

BOWNES, Circuit Judge.

There are two issues presented on this Petition for enforcement of a decision and order of the National Labor Relations Board: [1]

1. 229 NLRB 52.

1. Was the Board correct in its finding that a statement by the hospital's associate director at an employees' meeting violated section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1);[2]

2. Is the finding of the Board that the discharge of employees Marie Lyons and Ann Conway violated sections 8(a)(1) and (3), 29 U.S.C. § 158(a)(1) and (3) of the National Labor Relations Act, based on substantial evidence?

The technical employees of South Shore Hospital in Weymouth, Massachusetts, are represented by the Service Employees International Union, Local 880, AFL–CIO. The approximately twenty-five employees of the Central Service and Distribution Department (CS&D) of the hospital remain unorganized. The issues concern the statement and the activities of some of the employees of CS&D during the spring and early summer of 1975.

Sometime in late April or early May of 1975, Bette Hill, the manager of CS&D, and supervisor of Marie Lyons and Ann Conway, gave copies of the Union's constitution and bylaws to Lyons, Conway, and another employee, Joseph Murray, for perusal. Lyons took the documents home one evening, but did not read them. The next day, Hill requested that Lyons return the documents. Lyons read them and returned

them. Hill asked Lyons what she thought of the constitution, and Lyons responded that she thought the hospital was no place for a union. Hill said that she was glad to hear that Lyons had that opinion.

At a weekly meeting soon after this conversation, Hill asked the CS&D employees whether they wished to meet with the hospital's Associate Director Topham in order to find out more about the Union. Since a majority of the employees indicated that they favored such a meeting, a session was scheduled for May 21, 1975. The administrative law judge specifically found:

> In his discourse, Topham reviewed the pros and cons of unionization and answered questions put to him from the floor. . . . [In] response to a query, Topham stated that "no matter what the union got the union employees, the hospital employees would also get." . . . Lyons asked Topham "what percent of people you needed . . . to start a union and also how do you go about starting a union." In reply, Topham remarked that "he hoped it never got to that." Appendix at 2–3.

The administrative law judge also found that at a business meeting Hill told another employee (Celestino) that Lyons:

> **2.** (a) It shall be an unfair labor practice for an employer—
>> (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
>> \* \* \* \* \* \*
>> (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided*, That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this subsection as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section 159(a) of this title, in the appropriate collec-
>
> tive-bargaining unit covered by such agreement when made, and (ii) unless following an election held as provided in section 159(e) of this title within one year preceding the effective date of such agreement, the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to rescind the authority of such labor organization to make such an agreement: *Provided further*, That no employer shall justify any discrimination against an employee for nonmembership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership, . . . . 29 U.S.C. § 158(a)(1) and (3).

was involved with the Union, that . . [she] had union cards and . . . was trying to force people to sign them, and that . . . [Lyons] was leading a hate campaign against Ms. Hill. App. at 3.

He further found that:

the EKG department head[,] . . . a Statutory supervisor, informed Ann Conway that . . . "talk of central['s] having a union was all over the hospital." App. at 3.

In early June of 1975, Lyons contacted the Union and was advised to schedule an organizational meeting. Both Lyons and Conway notified the CS&D employees that a meeting would be held at Lyons' apartment on June 19, 1975. A second organizational meeting was held at Conway's home on July 2, 1975. Approximately six employees were in attendance at each meeting, including Lyons and Conway, and most of those present executed union authorization cards. On July 3, the hospital discharged Lyons, and on July 7, it discharged Conway.

The hospital contends that Lyons and Conway were discharged solely for just cause: Lyons because she caused a demoralizing atmosphere in the department, and Conway for general poor work and specifically for dallying thirty to forty minutes in the bacteriology laboratory on July 7.

The administrative law judge found and the Board affirmed that the reasons given for the firing were "frivolous" and that Topham's comment was an unlawful promise of a benefit.

We treat first the issue as to whether Topham's comment violated section 8(a)(1) of the Act. Since the facts as to it are basically undisputed, we deal only with the law, accepting the facts as found by the administrative law judge and the Board.

The Supreme Court laid down the broad principles governing an employer's right of communication when faced with union organizing activities in *NLRB v. Gissel Pack-*

ing Co., 395 U.S. 575, 618, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547 (1969):

[A]n employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union, so long as the communications do not contain a "threat of reprisal or force or promise of benefit." He may even make a prediction as to the precise effects he believes unionization will have on his company. In such a case, however, the prediction must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control or to convey a management decision already arrived at to close the plant in case of unionization.

Employer free speech comes from two sources: (1) the First Amendment to the Constitution of the United States; and (2) the Free Speech Provisions of the National Labor Relations Act § 8(c), 29 U.S.C. § 158(c).[3]

An important element in determining whether speech is protected or an unfair labor practice is the employer's considerable economic power over its employees. *Gissel Packing Co., supra,* 395 U.S. at 617, 89 S.Ct. 1918. Statements which are determined to be coercive, such as threats of reprisal or force or promise of benefits, are not protected. *Textile Workers v. Darlington Mfg. Co.,* 380 U.S. 363, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965). Coerciveness is to be determined at least partially from the context in which the speech is made. *NLRB v. Virginia Electric & Power Co.,* 314 U.S. 469, 62 S.Ct. 344, 86 L.Ed. 348 (1941).

An employer's freedom of comment in the face of union organizing activity does not include an untrue statement that unionization may be expected to cost employees money, *NLRB v. Gorbea, Perez & Morell, S. en C.,* 300 F.2d 886 (1st Cir. 1962), or an employer's prediction that unionization

---

**3.** (c) The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit.

might result in unnecessary consequences deliberately inflicted by the employer, or a statement, made without any objective evidence, to the effect that consequences not within the control of the employer would be probable. *NLRB v. C. J. Pearson Co.*, 420 F.2d 695 (1st Cir. 1969). In holding that an employer had committed an unfair labor practice by granting seniority wage increases and insurance premium benefits for purposes of discouraging unionization, we looked at both the date of decision by management and the date of the announcement as they related to the scope of union activities and the proximity of a union election. *D'Youville Manor v. NLRB*, 526 F.2d 3 (1st Cir. 1975). *See NLRB v. Styletek*, 520 F.2d 275 (1st Cir. 1975).

On the other side of the coin, we have held that an employer's notice to employees that the Union sought to take away a wage increase was not a threat of reprisal or force or promise of benefit and did not constitute an unfair labor practice where the statement was susceptible of proof and equal time for contradiction was available. *Coletti's Furniture, Inc. v. NLRB*, 550 F.2d 1292 (1st Cir. 1977); *NLRB v. Gotham Industries, Inc.*, 406 F.2d 1306 (1st Cir. 1969).

The issue here is whether Topham's comment made in response to a query at a meeting suggested by the hospital and then requested by the CS&D employees is a violation of the Act. Topham testified that he was asked whether the hospital discriminated between union and nonunion employees. He responded that the hospital did not discriminate and then made the critical comment, "no matter what the union got the union employees, the hospital employees would also get."[4]

The Board, in its brief, places principal reliance on *Casey Manufacturing Company v. United Shoe Workers of America, AFL–CIO*, 167 N.L.R.B. 89 (1967), in which it held that an unsolicited speech to employees on the day before the scheduled NLRB election containing a statement similar to the one here was an unfair labor practice.

> [W]e had to maintain the same working conditions in all our plants because of their close proximity. *Id.* at 96.

In finding that these words constituted an unlawful promise of benefits, the Board stated:

> In our view, . . . [the] statement, in the circumstances prevailing at the time it was made, in effect, was an announcement that the Casey employees would receive all the benefits of a union contract without a union, and was, therefore, by clear implication, a promise of benefits made for the purpose of coercing the employees into rejecting the Union and in violation of Section 8(a)(1) of the Act.[5] *Id.* at 8.

The circumstances prevailing in *Casey* were not at all the same or even similar to the ones before us. While in *Casey* the election was to be the very next day, no election had even been requested, let alone scheduled, at South Shore Hospital. The Board noted that the statement in *Casey* was unsolicited; here the administrative

---

4. Topham's version of what he actually said is slightly different, Record at 311, but we accept the Board's version.

5. The Board, in finding that this speech was unprotected, overturned the contrary finding of the trial examiner over the dissent of one of its members. The trial examiner's opinion, on which the dissent relied, reasoned:

> All that . . . [the employer] did on June 6 was to remind his audience of the Respondent's policy of treating the employees of all its plants alike, thereby impliedly promising to continue to follow that policy. . . . [T]his was a long standing policy, and its validity is not here attacked. Its reiteration at a time when negotiations at [another of the employer's plants in close proximity] . . . had apparently resulted in agreement for additional benefits was not the disclosure of any new approach. On the contrary, it served merely to underscore something of which the employees were already fully aware—namely, that any fruits of collective bargaining won by the [Union] employees through the efforts of their statutory bargaining agent would automatically accrue to the Casey employees, in accordance with the Respondent's longstanding commitment. It is therefore concluded that, by this statement, . . . [the employer] did not make a promise of benefit to the Casey employee in violation of the Act. *Id.* at 96–97.

law judge found that the statement came "in response to a query."[6]

The Board also relied on two other cases, *NLRB v. Exchange Parts Co.*, 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964), and *NLRB v. Sandy's Stores, Inc.*, 398 F.2d 268, 270 (1st Cir. 1968). Both of these cases dealt with new benefits. In *Exchange Parts*, the employer actually had conferred a new benefit, an additional paid holiday. *Sandy's Stores* involved more than a promise of changes; the company's president "announced changes in company personnel policy which . . . included some newly instituted employee benefits." *Id.* at 270. This occurred "well after the union's organizational campaign had begun . . . ." *Id.*

■ The Board's holding that Topham could not respond to the legitimate question of an employee concerning hospital policy with an answer which was neither untruthful nor misleading is tantamount to finding that the meeting was itself coercive and illegal. This amounts to a rejection of the employer free speech provision of the Act and a departure from the interpretation it was given in *Gissel, supra.* The Board's ruling was in error.

The next issue is whether there was substantial evidence to support the determination of the administrative law judge and the Board that Lyons and Conway were discharged because of their Union activities. *See Stone & Webster Engineering Corp. v. NLRB*, 536 F.2d 461, 464 (1st Cir. 1976). "[T]his court's limited function . . . is merely to determine whether on the record as a whole there is substantial evidence to support the Board's findings." *NLRB v. Universal Packing Corporation*, 361 F.2d 384, 387 (1st Cir. 1966). We must examine the record to ascertain whether the Board has met the burden of proof imposed on it in case of alleged unfair discharges, keeping in mind the fact finding advantage of the administrative law judge and the experi-

ence of the Board in labor disputes. *Stone & Webster, supra,* at 464; *Editorial "El Imparcial," Inc. v. NLRB*, 278 F.2d 184, 187 (1st Cir. 1960). Initially, the Board must show that the employer had knowledge of the union activity. *Stone & Webster, supra,* at 464; *NLRB v. Gotham Industries, Inc.*, 406 F.2d 1306, 1310 (1st Cir. 1969); *NLRB v. Joseph Antell, Inc.*, 358 F.2d 880 (1st Cir. 1966). Once the Board has met this burden, it then must show that the discharges were wrongly motivated. *Stone & Webster, supra,* at 464. If the employer had both a permissible and an impermissible reason for discharging the employees (in this case, work related reasons and an anti-union animus), "the Board must show an 'affirmative and persuasive reason why the employer rejected the good cause and chose a bad one.'" *Stone & Webster, supra,* at 464–465, quoting *Gotham Industries, Inc., supra,* at 1310, and *NLRB v. Billen Shoe Co.*, 397 F.2d 801, 803 (1st Cir. 1968). *See Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 284–287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Mack v. Cape Elizabeth School Board*, 553 F.2d 720, 722 (1st Cir. 1977).

## MARIE LYONS

There is no question, and the hospital concedes, that it was aware of Lyons' union activity. As is usual in discharge cases, the pivotal question is "motive." *NLRB v. Lipman Brothers, Inc., et al.*, 355 F.2d 15, 20 (1st Cir. 1966). Since direct evidence of motive is "seldom attainable," the Board may infer intent from the circumstances surrounding discharges. *NLRB v. Yale Manufacturing Co.*, 356 F.2d 69, 74 (1st Cir. 1966); *NLRB v. Bird Machine Co.*, 161 F.2d 589, 592 (1st Cir. 1947). The Board is far better suited than are we for drawing these inferences. *Lipman Brothers, Inc., supra,* 355 F.2d at 20–21; *Editorial "El Imparcial," Inc., supra,* 278 F.2d at 187.

---

**6.** Although the administrative law judge found that the statement was in response to a query, App. at 3, he went on to label the statement "unsolicited." App. at 4. The Board noted that the statement came in response to a question. The Record is clear that the comment was made in response to a question.

The hospital argues that the creation of an atmosphere of dissension is lawful reason for an employer to discharge its employee and cites *NLRB v. Miami Coca-Cola Bottling Co.,* 222 F.2d 341 (5th Cir. 1955), and *NLRB v. Reynolds International Pen Co.,* 162 F.2d 680 (7th Cir. 1947). From this contention, it alleges good cause, thus shifting the burden to the Board to show why the employer rejected the good cause for the unlawful one. *Stone & Webster, supra,* 536 F.2d at 464–465; *Gotham Industries, supra,* 406 F.2d at 1310. The conversations between Hill and Lyons and Hill and Celestino (Lyons' mother and also a hospital employee) and the timing of the discharge are substantial evidence for the Board's findings.

Based on the testimony of Celestino and Lyons' testimony concerning her conversation with Hill, it can fairly be inferred that most of the acrimony and turmoil in the department was a result of the conflict engendered by the efforts of the Union led by Lyons to organize and the attempt by Hill and the hospital to counter this. The administrative law judge and one member of the Board went so far as to find "that Respondent had created the impression that Respondent had its Central Service and Distribution employees' Union activities under surveillance. . . ." App. at 4.

A fair reading of the transcript leads to the conclusion that Lyons was discharged because of her open and continued union organizing activities.

### ANDREA (ANN) CONWAY

The hospital contends that it was not aware of Conway's union activities and she was fired solely because of a continuous poor work record triggered by a flagrant delay in the performance of a specific task on the day she was discharged.

Unlike Lyons, Conway had received two warnings as to the quality of her work in the past, had been suspended once for three days for failure to carry out an assignment, and there is testimony to the effect that the hospital supervisors were very unhappy with her performance long before the union organizing started. Despite her poor work record, however, the hospital employed her for more than a year. She was not discharged until after the union organizing effort was well under way.

The key question is whether the hospital had knowledge of Conway's union activities. It is now well established that such knowledge need not be based on direct personal observation, but can be inferred from the facts and circumstances involved. *Chauffeurs, Teamsters and Helpers, Local 633 of New Hampshire v. NLRB,* 166 U.S.App. D.C. 157, 163–164, 509 F.2d 490, 496–497 (1974); *A. J. Krajewski Manufacturing Co. v. NLRB,* 413 F.2d 673 (1st Cir. 1969); *NLRB v. Pembeck Oil Corp.,* 404 F.2d 105, 110 (2d Cir. 1968); *Joseph Antell, Inc., supra,* 358 F.2d 880.

The leading case in this area, at least in this circuit, is *Joseph Antell, Inc., supra. Antell* involved two unconnected cases, *Antell* and *Malone Knitting,* the question in both being whether there was sufficient evidence of employer knowledge of union activity to sustain a finding of an unfair labor practice.

In the *Antell* case, the only union activity by the employee was attending one union meeting held off the premises in the evening. We held that, despite the small size of the plant and the community in which it was located, this was not sufficient evidence on which to base knowledge of union activity and observed: "The smallness of the plant, or staff, may be material, but only to the extent that it may be shown to have made it likely that the employer had observed the activity in question." *Id.* at 882.

In the companion case, *Malone Knitting,* there was open, in-plant, union activity by the employee, but no evidence that anyone from management observed it. We stated:

Standing alone, since there was no affirmative evidence that management saw her, this might still be a weak and insufficient basis to infer knowledge. However, unlike *Antell,* where there was not even a possibility of observation, and

therefore not even a weak basis for an inference which could be reinforced, here there was at least a possibility which might be thought sufficient if there was other, affirmative, evidence indicating the likelihood that the employer in fact knew. *Id.* at 883.

We have carefully examined the record to determine if there is substantial evidence to support the finding of the administrative law judge, upheld by the Board, that Conway was discharged not because of her work performance, but because she was a known or suspected union adherent.

■ We first note that neither the administrative law judge nor the Board made any reference to Conway's poor work record and the legitimate reasons that the hospital had for dismissing her. They concluded without any citation to supporting evidence that the hospital was aware of Conway's union activities. In *NLRB v. Fibers International Corporation*, 439 F.2d 1311, 1312 (1st Cir. 1971), we stated:

> Having in mind that a business decision is involved, it has been our position that the Board has the burden of making a clear showing that the employer's dominant motive was not a proper business one, but union animus.

We adhere to this position.

To ignore the work record of a discharged employee is hardly the way to make a clear showing that the hospital's dominant motive was not a proper business one.

The record reveals the following facts as to Conway's union activities:

(a) Lyons and Conway were close friends, and both notified the departmental employees, either during coffee breaks in the hospital or by telephone, about the Union meetings;

(b) The hospital was fully aware of Lyons' union activities and the organizing effort generally; and

(c) The timing of the discharge.

These facts viewed separately or collectively are neither direct nor circumstantial evidence that the hospital actually knew of Conway's activities. In *Malone Knitting*,

the gap between a possibility that there might have been observation of the Union activity was bridged by the company's giving a reason for the firing "inconsistent with its previous practice, against its apparent interest and inconsistent with subsequent actions." *Malone Knitting, supra*, at 883.

The nature of the discharge, therefore, becomes critical.

The hospital claims that Conway was fired on July 7, four days after Lyons' discharge, and five days after a union meeting at her house because she allegedly dawdled from thirty to forty minutes in the bacteriology laboratory while on assignment. Bette Hill, Conway's supervisor and the one who discharged her, did not personally observe Conway dallying, but testified that she relied on what was told her by the lab supervisor, Mrs. Fontaine. Conway emphatically denied that she dallied in the laboratory for thirty to forty minutes, and testified that she was there for only about five minutes. Two other witnesses, Evelyn Pelky and Lorraine Forbes, testified that they were at the lab at the same time as Conway and Fontaine and that Conway was not there for much longer than five minutes. Fontaine did not testify.

■ The administrative law judge emphasized that Hill made no attempt to investigate or corroborate what Fontaine told her, but the question is the motive for the discharge, not the actual circumstances. Given Conway's work record, Hill was justified in accepting her fellow supervisor's statement as to Conway's dawdling in the bacteriology laboratory. If Conway did delay completing her assignment for thirty-five to forty minutes or if Hill believed that she did, there was a proper business motive for firing her on the spot.

■ The timing of the discharge makes this a close case, but, unlike Lyons, there is no substantial evidence on which to ground a finding that the hospital knew of Conway's union activities, and the Board has failed to make a clear showing that the dominant motive was union animus and not

a proper business one. *NLRB v. Fibers International Corporation, supra.*

The findings and rulings of the administrative law judge and the Board are reversed as to the Topham comment and the dismissal of Conway, but affirmed as to the dismissal of Lyons. The Union notice will be modified accordingly.